[Nos. A058820, A059824, A059826, A059830. First Dist., Div. Two. Apr. 29, 1994.]

VALLEJO DEVELOPMENT COMPANY, Plaintiff and Appellant, v. BECK DEVELOPMENT CO., INC., et al., Defendants and Respondents.

[No. A059202. First Dist., Div. Two. Apr. 29, 1994.]

VALLEJO DEVELOPMENT COMPANY, Plaintiff and Appellant, v. BROADMOOR HOMES SOUTHWEST, INC., et al., Defendants and Respondents.

[No. A060054. First Dist., Div. Two. Apr. 29, 1994.]

VALLEJO DEVELOPMENT COMPANY, Cross-complainant and Appellant, v. MISSION INVESTMENT, LTD., et al., Cross-defendents and Respondents.

**COUNSEL**

O'Connor, Packer & Dunivan, J. Robert O'Connor III, Laura W. Packer and Lori L. Dunivan for Plaintiff and Appellant and for Cross-complainant and Appellant.

Miller, Starr & Regalia, Edmund L. Regalia, Micheal J. Hassen, Rader, Rader, Goulart & Gray, Paul W. Goulart, Capps, Staples, Ward, Hastings & Dodson, Kenneth C. Ward, Lillick & Charles, H. Donald Harris, James J. Ficenec, Mark A. Muro, Irell & Manella, Sheldon Eisenberg, Richard M. Birnholz and David Lowe for Defendants and Respondents.

Modena & Royce and Daniel J. Modena for Cross-defendants and Respondents.

**OPINION**

**PHELAN, J.**—Appellant Vallejo Development Company (VDC) timely appeals from judgments of dismissal entered by the Solano County Superior Court as to each of four complaints (Nos. 117843, 117845, 117846, and 112275) by which VDC sought to recover payment from several "merchant builders" for whom VDC agreed to install infrastructure improvements in a large, unfinished commercial/residential project in Vallejo, commonly known as "Northgate." The trial court accepted the respondents' argument that VDC cannot prosecute any of its claims for compensation—whether characterized as actions on the contract or in quasi-contract, actions to foreclose a mechanic's lien, actions to enforce a vendor's lien, or otherwise —because, during the time it was providing the agreed-upon services to respondents, it did not have a valid contractor's license as required by

section 7031, subdivision (a), of the California Business and Professions Code.[1] Appellant argues that, as a "master developer" for the Northgate project, it merely furnished labor and materials through licensed, third party general contractors and that it was not, therefore, a "contractor" within the meaning of sections 7026 and 7031. As we will discuss, this argument is foreclosed by the plain meaning and legislative history of these statutes, and by the California Supreme Court's recent decision in *Hydrotech Systems Ltd.* v. *Oasis Waterpark* (1991) 52 Cal.3d 988, 997 [277 Cal.Rptr. 517, 803 P.2d 370] (hereinafter *Hydrotech*). We affirm.[2]

## I. FACTUAL AND PROCEDURAL BACKGROUND

In 1988, W. Wolf Industries, Inc. (Wolf) purchased approximately 1,200 acres of undeveloped real property in Vallejo, California, for development of a master planned community known as "Northgate." As a condition of approval of the specific area plan for the project, the City of Vallejo (City) required installation of those infrastructure improvements necessary for Northgate, plus additional improvements for the benefit of the Vallejo community as a whole.[3] Wolf and its successor-in-interest,[4] VDC, subsequently sold six residentially zoned parcels (commonly known as neighborhoods) to various "merchant builders," respondents herein, that would complete and sell individual homes. The purchase agreements accomplishing these transactions divided the purchase price into two distinct parts: (1) the cost of the land, at a specified rate per "approved lot"; and (2) the "improvement cost," at a specified amount per lot.

The purchase agreements also contained provisions by which VDC promised that, after the close of escrow on the land sale transactions, it would

[1]Unless otherwise indicated, all further statutory references are to the Business and Professions Code.

[2]On March 10, 1993, appellant filed a request to take judicial notice by which it sought to bring to this court's attention various pleadings and orders from similar, but unrelated cases involving master developers in state and federal trial courts in Northern California. We denied appellant's request by order filed March 29, 1993. On May 10 and 21, 1993, respondents also filed requests for judicial notice, seeking to present to this court a complete set of the mechanic's liens recorded by VDC in connection with the Northgate project, as well as two complaints filed in related cases involving appellant and certain of the respondents. We granted respondents' requests by orders filed June 1 and 17, 1993.

[3]Local agencies may require a subdivider to install infrastructure improvements of "supplemental size, capacity, number, or length for the benefit of property not within the subdivision" (Gov. Code, § 66485), and must also agree to reimburse the subdivider, but only for "that portion of the cost of those improvements . . . *in excess of the construction required for the subdivision*" (Gov. Code, § 66486, italics added). For purposes of our review, we assume the truth of VDC's allegations that such "excess" improvements were required by the City of Vallejo and installed by VDC in conjunction with its activities to improve the site for the benefit of the subdivision.

[4]In November 1988, Wolf assigned to VDC all its rights to purchase the Northgate property and its rights under its contracts with respondents.

"improve the Property in accordance with the City approved plans and specifications to a Finished Lot Condition," including grading for building pads, and installation of storm drains, water, sewer, utilities, streets, curbs and gutters. In its agreements with respondent Broadmoor Homes Southwest, Inc. (Broadmoor), VDC specifically agreed that it would be "*solely responsible*" for completion of all offsite, onsite and infrastructure improvements required in connection with the development of the [Northgate] Property, including without limitation grading, storm drainage, sanitary systems, streets, curbs, gutters, utilities, street lighting, traffic signals, sidewalks, landscape buffer areas . . . ." As alleged in VDC's first amended complaint, these were agreements to "provide all of the labor, equipment, and materials necessary to be used and consumed in construction of all onsite and offsite improvements . . . ." VDC further alleged that, pursuant to these agreements, it "furnished all necessary labor, equipment, services and material to be used or consumed in, and which were actually used or consumed in, the construction of the onsite and offsite improvements." However, VDC qualified these allegations by stating that it acted as a mere "administrator" in connection with this construction work, and that it furnished the requisite labor and materials through "licensed third-party contractors."[5] It is undisputed that, at all relevant times, VDC did not hold any type of California contractor's license.

Beginning in June 1991, various parties involved in the Northgate project, including respondents GDC/Broadmoor/Vallejo Associates and Mission Development, filed suit against VDC seeking rescission and damages for breach of contract for VDC's alleged failure to complete agreed-upon infrastructure improvements. VDC stopped all work on the Northgate project in September 1991.

Notwithstanding its failure to complete the agreed-upon infrastructure improvements, VDC recorded mechanics' liens in late 1991 against various parcels of the Northgate property, claiming entitlement to over $17 million dollars for "labor, services, equipment or materials" it claimed to have furnished for grading, storm drains, sewers, waterlines, trenches, paving, and other onsite and offsite improvements to the neighborhoods. On March 17, 1992, VDC filed the within actions seeking to foreclose upon its mechanics' liens, to recover the reasonable value of services furnished, to recover an agreed price for improvements, and to recover on an open book account.

---

[5] In an attempt to avoid the effect of the trial court's ruling on respondents' demurrers, VDC lodged with the court proposed second amended complaints in Nos. 117843, 117845, and 117846. In those complaints, VDC deleted all allegations referring to its promise to provide and its actual provision of "labor, equipment, services and materials . . . used or consumed in . . . the construction of the onsite and offsite improvements," claiming instead that it merely "caused the construction of offsite improvements."

Respondents promptly sought dismissal of VDC's complaints on the ground that VDC could not prosecute an action seeking compensation for services performed under the contracts because it had failed to allege that it was a duly licensed contractor. On June 3, 1992, prior to the time its opposition was due, VDC filed a petition under chapter 11 of the United States Bankruptcy Code, and chose not to oppose respondents' motions on the merits. Instead, VDC asserted that the automatic stay of 11 United States Code section 362 prevented respondents from proceeding. On June 12, 1992, following a hearing, the trial court sustained respondents' demurrers without leave to amend. On July 8, 1992, the court granted Mission Development's motion for summary adjudication. Citing section 7031, and the Supreme Court's decision in *Hydrotech, supra,* 52 Cal.3d 988, the trial court ruled that, because VDC was not a licensed contractor at all times during its performance under its contracts with respondents, it could not state a cause of action for compensation for the services rendered.

On July 21, 1992, after VDC failed in its attempt to have the bankruptcy court set aside the orders sustaining the demurrers without leave to amend and granting summary adjudication,[6] VDC filed motions for reconsideration in the trial court, along with its proposed second amended complaints. On August 14, 1992, the trial court granted VDC's motion for reconsideration in order to afford VDC "a full hearing on the merits" of the various motions. After considering all material submitted in connection with respondents' motions, the court reaffirmed its prior orders, and ruled that the second amended complaints had no effect on the license requirement. The court thereafter entered judgment against VDC, dismissing all of its complaints. These timely appeals followed.

## II. Discussion

### A. *The Trial Court Did Not Err in Holding That VDC's Claims Are Barred by Section 7031.*

VDC's sole contention on appeal is that the trial court erred in applying section 7031 as a bar to its claims against the merchant builders. This is a question of law to which we apply a de novo standard of review. (*Parsons* v. *Bristol Development Co.* (1965) 62 Cal.2d 861, 861-865 [44 Cal.Rptr. 767, 402 P.2d 839]; see also Code Civ. Proc., § 589.)

Section 7031 provides, with exceptions not relevant here, that ". . . no person *engaged in the business or acting in the capacity of a contractor,* may

---

[6]The bankruptcy court refused to issue a temporary restraining order requested by VDC to restrain all further proceedings in the Solano County Superior Court, and entered an order permitting the state court to decide the pending law and motion matters on the merits.

bring or maintain any action, or recover in law or equity in any action, in any court of this state for the collection of *compensation for the performance of any act or contract for which a license is required* by this chapter without alleging that he or she was a duly licensed contractor at all times during the performance of that act or contract, regardless of the merits of the cause of action brought by the person." (Italics added.)

■ California's strict contractor licensing law reflects a strong public policy in favor of protecting the public against unscrupulous and/or incompetent contracting work. As the California Supreme Court recently reaffirmed, "The purpose of the licensing law is to protect the public from incompetence and dishonesty in those who provide building and construction services. [Citation.] The licensing requirements provide minimal assurance that all persons offering such services in California have the requisite skill and character, understand applicable local laws and codes, and know the rudiments of administering a contracting business." (*Hydrotech, supra,* 52 Cal.3d at p. 995.)

VDC admits that, at all relevant times during its performance under the contracts with respondents, it was not a duly licensed contractor. ■ VDC argues, however, that it functioned as a "master developer" or mere "administrator," and not as a "contractor," when it contracted and undertook to provide construction services to install the offsite infrastructure improvements for Northgate. VDC also argues that the furnishing of construction services was "merely 'incidental' " to the object of its bargain with the merchant builders. Further, even if it technically falls within the definition of a "contractor," VDC maintains that its claims should not be barred by section 7031. This latter argument is tantamount to a request that this court legislate some type of public-policy-based exception to section 7031 for "master developers," i.e., for those subdividers who act "in the capacity of a contractor" by agreeing to provide infrastructure improvements for a master-planned community, but who are also involved in and subject to requirements imposed by state and local government during the subdivision and mapping processes for the project. We reject these arguments, which are clearly better directed to the state Legislature.

    1.   *In the Instant Actions, VDC Was Seeking Compensation for the Performance of Acts for Which a License Was Required.*

The first question we must decide is whether, in the instant actions, VDC is seeking "compensation for the performance of any act or contract for which a license is required" within the meaning of section 7031. We readily conclude that it was.

The Business and Professions Code describes the contracting business as consisting of three branches, with three parallel classifications for contractors' licenses: class A (general engineering contractor), class B (general building contractor), and class C (covering "specialty" licenses). (§§ 7055-7058.) Of particular relevance to this case, section 7056 defines the scope of work for which a class A license is required, as follows: "[F]ixed works requiring specialized engineering knowledge and skill, including . . . irrigation, drainage, water power, water supply, flood control, . . . , highways, streets and roads, . . . sewers and sewage disposal plants and systems, . . . land leveling and earthmoving projects, excavating, grading, trenching, paving and surfacing work and cement and concrete works in connection with the above mentioned fixed works." It is clear from this provision that the work VDC agreed to complete for the merchant builders is of the type for which a general engineering contractor's license is required. VDC does not and, we think, cannot dispute this point.

Nor can VDC seriously contend that the particular claims asserted in these actions are exempt from the bar of section 7031. ▮ The California courts have consistently applied section 7031 to foreclose actions seeking to enforce a mechanic's lien, to recover for breach of a construction contract, or to obtain the reasonable value of labor and materials furnished. (See, e.g., *Gonzales* v. *Concord Gardens Mobile Home Park, Ltd.* (1979) 90 Cal.App.3d 871, 874 [153 Cal.Rptr. 559] [breach of contract or reasonable value of labor and materials]; *Davis Co.* v. *Superior Court* (1969) 1 Cal.App.3d 156, 159 [81 Cal.Rptr. 453] [same]; *Albaugh* v. *Moss Construction Co.* (1954) 125 Cal.App.2d 126, 132 [269 P.2d 936] [enforcement of mechanic's lien].) Indeed, as our Supreme Court recently held, "[S]ection 7031 bars all actions, however they are characterized, which effectively seek 'compensation' for illegal unlicensed contract work." (*Hydrotech, supra,* 52 Cal.3d at p. 997.) ▮ We hold that the bar of section 7031 extends to all of the claims asserted by VDC in this action. Our holding on this point encompasses the cause of action for enforcement of a vendor's lien asserted in VDC's proposed second amended complaint. VDC offers no principled argument for distinguishing that cause of action from others by which it is seeking recovery of "compensation" for work for which a contractor's license is required.

### 2. *VDC Acted "in the Capacity of a Contractor" With Respect to the Construction of Infrastructure Improvements at Northgate.*

We turn next to the central issue in this appeal: Whether VDC acted "in the capacity of a contractor" when it agreed to be responsible for completion of—and undertook to complete—the off-site infrastructure improvements at Northgate. If it did, its fate under section 7031 will be sealed.

Section 7026 defines a "contractor" as "*any person, who undertakes to* or offers to undertake to or purports to have the capacity to undertake or submits a bid to, *or does himself or by or through others, construct, alter, repair, add to, subtract from, improve . . . any building . . . or other structure, project, development or improvement,* or to do any part thereof . . . ." (Italics added.) The term "person," as used in section 7026, includes any "individual, [] firm, copartnership, corporation, association or other organization, or any combination thereof" that enters into a construction contract. (§ 7025.)

After a careful review of both the terms of the agreements between VDC and respondents, and VDC's allegations as to the nature and scope of those agreements, we are persuaded that by entering into the agreements with respondents, and by performing as required under the terms of the agreements, VDC was acting "in the capacity of a contractor" for the Northgate project. By entering into the agreements to "improve the Property" and to be "*solely responsible* for completion of" infrastructure improvements—including graded building pads, storm drains, sanitary systems, streets, sidewalks, curbs, gutters, utilities, street lighting, and traffic signals—VDC was clearly contracting to provide construction services in exchange for cash payments by respondents. ▮ The mere execution of such a contract is an act "in the capacity of a contractor," and an unlicensed person is barred by section 7031, subdivision (a), from bringing claims based on the contract. (*Brunzell Constr. Co.* v. *Barton Development Co.* (1966) 240 Cal.App.2d 442, 444 [49 Cal.Rptr. 667].)

The actual construction of infrastructure improvements also involved performance of a "contract for which a license is required." (§ 7031, subd. (a).) That is, even if VDC performed only administrative and oversight functions with respect to the actual installation of infrastructure improvements, it nevertheless acted "in the capacity of" a general engineering contractor by performing those functions in fulfillment of contractual obligations owed to the owners of the property on which the improvements were installed.

Our conclusion on this point is bolstered by the provisions of the Civil Code which govern creation of mechanic's liens for "work[s] of improvement" or "site improvement[s]," both of which appear to be at issue in this case. (Civ. Code, §§ 3106, 3110 [construction of roads, grading of any lot or tract of land]; Civ. Code, §§ 3102, 3112 [grading of any lot or tract of land, construction and installation of sewers and other public utilities].) For purposes of those provisions, a "contractor" is one who has a *direct* contractual relationship with an owner of real property who agrees to provide *both*

labor and materials for the improvement of the owner's real property. (Civ. Code, §§ 3088, 3095.) As far as this record discloses, VDC was the only person functioning in that capacity with respect to the installation of infrastructure improvements at Northgate.

■ The fact that VDC subcontracted with licensed contractors to provide the actual labor, equipment and materials to construct the infrastructure improvements is irrelevant.[7] Section 7026 plainly states that both the person who provides construction services himself and one who does so "through others" qualifies as a "contractor." ■ The California courts have also long held that those who enter into construction contracts must be licensed, even when they themselves do not do the actual work under the contract. (See *Currie* v. *Stolowitz* (1959) 169 Cal.App.2d 810, 815-816 [338 P.2d 208]; *Hollywood T. C. Co.* v. *Structural P. C. Bd.* (1949) 95 Cal.App.2d 56, 58-59 [212 P.2d 278].) Indeed, if this were not the rule, the requirement that general contractors be licensed would be completely superfluous. VDC cannot hide behind the fact that licensed contractors installed the site improvements which it agreed to complete.

■ It is also irrelevant that respondents *knew* all along that VDC was not a licensed contractor. (*Hydrotech, supra,* 52 Cal.3d at pp. 997-998.) Indeed, section 7031 bars even an unlicensed contractor's claim for fraud when the deceit alleged was a false promise by the consumer of construction services to obtain a contractor's license for the party seeking compensation. (*Hydrotech, supra,* 52 Cal.3d at pp. 993.)

■ Despite the fact that it falls within the literal terms of sections 7026 and 7031, VDC contends that we should not apply those sections to bar its claims against respondents. VDC reasons that applying section 7031 to master developers will not serve the protective purposes of the licensing laws and is, in fact, contrary to public policy in that it will increase the cost to the consuming public of housing in master-planned communities. We decline VDC's invitation to create by judicial fiat an implied exception to section 7031 for master developers. (Cf. *Hydrotech, supra,* 52 Cal.3d at p. 992 ["section 7031 contains no implied exceptions for . . . 'exceptional circumstances' "].)

In the first place, we find that applying the contractor licensing requirement to master developers, such as VDC, is consistent with public policy as

---

[7]To the extent VDC's argument on this point is some type of claim of "substantial compliance" with the licensing laws, the argument clearly fails. In the 1989 amendments to section 7031, the Legislature specifically declared that this judicially declared doctrine cannot be invoked to avoid the bar to recovery contained in that section, except in extremely narrow circumstances set forth in the statute. (§ 7031, subd. (d).)

declared by the state Legislature when it amended section 7044 in 1988 and, thereby, effectively broadened the coverage of section 7031. (Stats. 1988, ch. 1035, § 1.3, p. 3365.) At that time, the Assembly Committee on Governmental Efficiency and Consumer Protection commented that consumer protection required an *expansion* of licensing requirements with respect to residential development projects: "The purpose of this bill is to extend the protections of the Contractors' State License Law to persons who buy tract houses built under the owner exemption." (Assem. Com. on Governmental Efficiency and Consumer Protection, 3d reading analysis of Assem. Bill No. 3953 (1987-1988 Reg. Sess.) as amended May 5, 1988.) Specifically, the 1988 amendment was designed to provide consumers with recourse to the Contractors' State Licensing Board (CSLB) against certain owner-builders, as to whom the CSLB previously had no authority to order restitution or take disciplinary action. (Assem. Com. on Governmental Efficiency and Consumer Protection, 3d reading analysis of Assem. Bill No. 3953 (1987-1988 Reg. Sess.) as amended Apr. 14, 1988.) Further, staff analysis performed for the Senate Committee on Business and Professions explained that the 1988 amendments were "aimed at protecting consumers from unscrupulous builders who evade punishment by the CSLB because those builders are not required to be licensed by the board under existing exemptions in the law." (Sen. Rules Com., 3d reading analysis of Assem. Bill No. 3841 (1987-1988 Reg. Sess.) as amended Aug. 24, 1988.)[8]

The Legislature has determined that ultimate responsibility for construction work must rest with a licensed contractor—in this case, a licensed general engineering contractor—who has demonstrated the requisite competence in the construction business. This policy ensures that all subcontractors and materialmen on a project will be answerable to and directed by someone whose knowledge and experience meet uniform requirements. In addition, this policy protects consumers of the contractor's services by making all persons who are responsible for construction projects subject to the regulatory powers of the CSLB. As our Supreme Court recently observed, "The protective purposes of the licensing law cannot be satisfied in full measure unless the 'continuing competence and responsibility' of those engaged in the work for which compensation is sought have been officially examined and favorably resolved." (*Hydrotech, supra,* 52 Cal.3d at pp. 996.) It would be anomalous, indeed, to exclude from this regulatory scheme those persons who bear ultimate responsibility for supervising and directing the construction of improvements in large-scale, residential development projects within the state.

[8]The 1988 amendments to section 7044 were originally contained in Assembly Bill No. 3953, 1987-1988 Regular Session, but were ultimately enacted as part of Assembly Bill No. 3841. (Stats. 1988, ch. 1035, § 1.3, p. 3365.)

If the Legislature intended to exempt "master developers" from the contractor's licensing laws, it easily could have done so. On the other hand, judicial recognition of such an exemption would open a Pandora's box, as there is no substantive difference between VDC's claim that it merely intended to administer or supervise the work of licensed contractors, and other situations in which unlicensed parties have argued that they should be allowed to recover on their contracts by virtue of their having subcontracted out the work to be performed by licensed contractors. The Legislature's conclusion is precisely the opposite: It is improper for an unlicensed person to develop property for public sale even if licensed contractors work under the unlicensed person. VDC's efforts to rewrite California contractor's licensing law must be directed to the Legislature, not to the courts.

California courts have long recognized that we must not substitute our judgment in matters of public policy for that of the Legislature. In *Howard* v. *State of California* (1948) 85 Cal.App.2d 361 [193 P.2d 11], for example, the plaintiff filed suit to prevent the state from prosecuting him for entering into painting contracts without a license. Demurrers to the complaint were sustained without leave to amend, and plaintiff appealed. (*Id.* at p. 362.) On appeal, Howard asserted that the ". . . regulation of the business of painting contractors is not within the legislative power of the state, in that such regulation has no reasonable tendency to promote the public health, morals, safety or welfare." (*Id.* at p. 364.) The Court of Appeal declined Howard's invitation to substitute its own judgment for that the Legislature, explaining that "We do not agree that there is less reason for the regulation of the business of painting contractors than that of other contractors who employ means, other than painting, by which a structure is wholly fabricated, or is repaired, altered or improved, so as to effect a change in its condition to one substantially different. The purpose of the act is to guard the public against the consequences of incompetent workmanship, imposition and deception. In order to procure a license an applicant is required to make a showing of good character and of a degree of experience and general knowledge of the building, health, safety and lien laws of this state, and of the rudimentary administrative principles of the contracting business, as the board deems necessary for the safety and protection of the public. (§§ 7068, 7069.) Willful breaches of contract and other willful and fraudulent acts, causing material injury to another, furnish grounds for suspension or revocation of a license. (§§ 7109-7119.) There is no less opportunity for dishonesty in the painting trade than in the other building trades. If there is no appreciable likelihood of it, or none at all, the Legislature has not recognized either of those conditions." (*Howard, supra,* 85 Cal.App.2d at p. 365.)

Similarly, we reject VDC's argument that there is less reason to regulate incompetence and dishonesty among master developers than among others

who act in the capacity of a general engineering contractor for smaller-scale projects. Until the Legislature makes such a finding, we are compelled to conclude that it intended to require master developers to make the same type of "showing of good character and of a degree of experience and general knowledge of the building, health, safety and lien laws of this state, and of the rudimentary administrative principles of the contracting business," as is required of other general contractors under the California contractor's licensing laws. (*Howard* v. *State of California, supra,* 85 Cal.App.2d at p. 365.)

We conclude that the trial court did not err in holding that VDC acted in the capacity of a contractor with respect to the construction of infrastructure improvements at Northgate.

### 3. *VDC's Involvement as an Unlicensed Contractor Was Not "Incidental" to the Overall Transaction Between the Parties.*

VDC also contends that it fits within an exception to the licensing requirement recognized by the California Supreme Court in *Hydrotech* for situations in which the construction of infrastructure improvements was "incidental" to the parties' overall business relationship. While the Supreme Court did suggest that an unlicensed contractor may be able to maintain an action in tort where ". . . the plaintiff's involvement as an unlicensed contractor was incidental to the overall agreement or transaction between the parties" (*Hydrotech, supra,* 52 Cal.3d at p. 1001), VDC stretches this notion to a point bordering on frivolousness. The agreements between VDC and respondents called for VDC to provide over $40 million worth of grading, water and sewer systems, utilities, storm drains, streets, curbs, sidewalks, gutters, and other improvements for the Northgate project. It further appears that VDC was occupied with the performance of these post-closing obligations for a period of over two years before it stopped all work on the Northgate project in September 1991. We have no doubt that these obligations were substantial and central to the parties' agreement regarding the Northgate development. Indeed, VDC itself concedes that the furnishing of site improvements was "integral" to and "required to provide the bargained-for object" of the transactions between it and the respondents. VDC's argument that its involvement as a contractor was "integral," yet "incidental" to its agreements with respondents is inherently contradictory and defies all reason.

### 4. *Denying Unlicensed Master Developers the Right to Enforce Their Construction Contracts With Merchant Builders Does Not Interfere With the Subdivision Map Act.*

In a final, desperate argument, VDC maintains that a refusal to enforce its rights under the contracts with respondents will create a "loophole" in the Subdivision Map Act. (Gov. Code, § 66410 et seq.) As we

understand it, VDC's argument is that the City could have required it to install certain "excess" infrastructure improvements (Gov. Code, § 66485), and would have been required by statute to enter into an agreement to reimburse VDC for those particular improvements (Gov. Code, § 66486). Because respondents did not want benefit or assessment districts imposed upon their property as a means of collecting the costs required by the reimbursement agreements (see, e.g., Gov. Code, § 66487, subd. (c)), however, they induced VDC to enter into agreements by which they purchased unimproved parcels and assumed a duty to provide reimbursement the City would otherwise have had to provide for the required infrastructure improvements. Thus, VDC argues, respondents "stepped into the shoes of the City of Vallejo." VDC concludes from this that not permitting it to recover from these "surrogates for the City" deprives it of compensation of which it would have been "assured" if only it had refused to structure the agreements as respondents and their lenders wished.[9]

To the extent we are able to decipher what VDC means by this argument, we reject it. In the first place, VDC would have been "assured" of reimbursement under Government Code section 66486 only for the excess capacity required for the benefit of the city, and *not* for the infrastructure improvements required for the Northgate project itself. As we read this record, the compensation for installation of "excess" improvements would have been only a small portion of the recovery VDC seeks in this action. Further, as it stands before this court, VDC is not an "owner-builder," and does not even argue that it falls within any of the express exceptions to section 7031. VDC's argument is, thus, sorely lacking in factual foundation and legal support.

Further, it is ridiculous to suggest that respondents assumed the City's statutory reimbursement obligations by entering into private agreements to pay VDC for installing infrastructure improvements on land they had purchased. VDC entered into the agreements with respondents voluntarily and, presumably, for profit. VDC was equally free to self-finance the infrastructure improvements before selling the neighborhood parcels, or to sell the land to respondents under the condition that respondents complete the infrastructure improvements required by city planning officials. It did not do

---

[9]Apparently, VDC is claiming that it would have entered into the hypothetical reimbursement agreement with the City as an "owner-builder" and, thus, would have been exempt from the bar of section 7031 by virtue of section 7044. Section 7044 applies only in three limited circumstances not present in the factual circumstances of the instant case. VDC cites no authority for the proposition that it would not have had to be licensed to recover statutory reimbursement from the City. However, we will assume, *arguendo*, that the "owner-builder exemption" would have precluded the City from invoking the bar of section 7031 against VDC's hypothetical claim for reimbursement.

so. Instead, it chose to assume ultimate responsibility for installation of *all* of the infrastructure improvements after taking the benefit of the land-sale transaction. Indeed, the sequence of events described by VDC in planning the Northgate development is equally susceptible to an interpretation that VDC knowingly and voluntarily waived the limited protections available to it under Government Code section 66486. Thus, any "loophole" in the Subdivision Map Act in the circumstances of this case is one of VDC's own making.

**B.** *The Trial Court Did Not Abuse Its Discretion by Denying Appellant Leave to File Its Second Amended Complaint.*

Finally, we turn to the issue whether the trial court erred by not allowing VDC to proceed under its proposed second amended complaint. We conclude that it did not.

"Generally, after an amended pleading has been filed, courts will disregard the original pleading. [Citation.] [¶] However, an exception to this rule is found in *Lee* v. *Hensley* [(1951) 103 Cal.App.2d 697, 708-709 (230 P.2d 159)], where an amended complaint attempts to avoid defects set forth in a prior complaint by ignoring them. The court may examine the prior complaint to ascertain whether the amended complaint is merely a sham." (*Kenworthy* v. *Brown* (1967) 248 Cal.App.2d 298, 302 [56 Cal.Rptr. 461].) The rationale for this rule is obvious. "A pleader may not attempt to breathe life into a complaint by omitting relevant facts which made his previous complaint defective." (*Hills Trans. Co.* v. *Southwest* (1968) 266 Cal.App.2d 702, 713 [72 Cal.Rptr. 441].) Moreover, any inconsistencies with prior pleadings must be explained; if the pleader fails to do so, the court may disregard the inconsistent allegations. (*Amid* v. *Hawthorne Community Medical Group, Inc.* (1989) 212 Cal.App.3d 1383, 1390 [261 Cal.Rptr. 240].) Accordingly, a court is "not bound to accept as true allegations contrary to factual allegations in former pleading in the same case." (*Potter* v. *Arizona So. Coach Lines, Inc.* (1988) 202 Cal.App.3d 126, 133, fn. 2 [248 Cal.Rptr. 284].)

Furthermore, as a matter of law, allegations in a complaint must yield to contrary allegations contained in exhibits to a complaint. (*Dodd* v. *Citizens Bank of Costa Mesa* (1990) 222 Cal.App.3d 1624, 1627 [272 Cal.Rptr. 623].) The mechanics' liens VDC seeks to enforce are attached as exhibits to each version of VDC's complaint, including the proposed second amended complaint. To the extent they conflict with factual allegations in the body of the complaint, the allegations contained in the mechanics' liens—made under oath on behalf of VDC by its senior vice president—must be accepted as true.

In this case, VDC did nothing to further its cause by merely omitting from the body of its complaint the allegations that it agreed to provide and provided "labor, equipment, services and materials . . . used or consumed in . . . the construction of the onsite and offsite improvements," and inserting, instead, the bald—and more vague—claim that it was a "master developer" who agreed to "improve" respondents' property, but merely "caused the construction of offsite improvements" by engaging licensed contractors to do the physical installation work. The allegations of the proposed second amended complaint are, at bottom, not materially different from those in VDC's prior pleadings, and are insufficient to conceal its true status as a "contractor."

After all its amendments and arguments, VDC's position remains that of a party that was responsible for construction of infrastructure improvements in the Northgate neighborhoods pursuant to an agreement with the property owners. Specifically, VDC still admits in its proposed second amended complaint that the agreements with respondents "required VDC to improve" the Northgate property, and that it "furnished to defendants . . . offsite improvements" at Northgate. In its briefs, VDC describes itself as a "claimant" who made "site improvement" at Northgate, for purposes of Civil Code section 3112. VDC also claims to be seeking enforcement of mechanics' liens as one who "contributed to works of improvement and/or the construction of site improvements." On this record, it was well within the trial court's discretion to conclude that VDC's proposed second amended complaint failed to state a cause of action, and that the insufficiency of its prior pleadings could not be cured by further amendment. (*Congleton v. National Union Fire Ins. Co.* (1987) 189 Cal.App.3d 51, 62 [234 Cal.Rptr. 218]; *California Casualty Gen. Ins. Co. v. Superior Court* (1985) 173 Cal.App.3d 274, 281 [218 Cal.Rptr. 817].)

## III. CONCLUSION

For all the foregoing reasons, we affirm the judgment of the trial court.

Smith, Acting P. J., and Benson, J., concurred.

Appellant's petition for review by the Supreme Court was denied June 30, 1994.