Filed 6/13/17

**CERTIFIED FOR PUBLICATION**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION ONE

|  |  |
|---|---|
| PHOENIX MECHANICAL PIPELINE, INC., <br><br> Plaintiff and Appellant, <br><br> v. <br><br> SPACE EXPLORATION TECHNOLOGIES CORP., <br><br> Defendant and Respondent. | B269186 <br><br> (Los Angeles County Super. Ct. No. BC 568084) |

APPEAL from a judgment of the Superior Court of Los Angeles County.  Rafael A. Ongkeko, Judge.  Reversed and remanded with directions.

The Ryan Law Firm, Kelly F. Ryan and Nathaniel P. Loakes for Plaintiff and Appellant.

Payne & Fears, Benjamin Avery Nix, Scott O. Luskin and Robert T. Matsuishi for Defendant and Respondent.

———————————————

Plaintiff and appellant Phoenix Mechanical Pipeline, Inc. (Phoenix Pipeline), appeals from a judgment entered after the trial court sustained the demurrer of defendant and respondent Space Exploration Technologies Corp. (SpaceX) without leave to amend. The trial court found that Phoenix Pipeline could not pursue its claims for payment for construction and related services against SpaceX because Phoenix Pipeline failed to allege that it had a contractor's license. After several attempts to cure this defect, the trial court concluded that Phoenix Pipeline could not amend to comply with the licensing requirement, and therefore sustained SpaceX's demurrer to Phoenix Pipeline's second amended complaint (SAC) without leave to amend.

Business and Professions Code section 7031, subdivision (a) requires a contractor's license to maintain an action for compensation for services for which a contractor's license is necessary.[1] The SAC does not allege that Phoenix Pipeline has such a license, and Phoenix Pipeline does not claim on appeal that it is licensed. Rather, Phoenix Pipeline asserts a variety of reasons why it need not be licensed to pursue this litigation. Phoenix Pipeline argues that: (1) it sufficiently complied with section 7031 by alleging that one of its employees, whom Phoenix Pipeline alleges was its "responsible manager officer," is a licensed contractor; (2) it did not need to be licensed to pursue its claims against SpaceX because SpaceX is a sophisticated corporate entity and section 7031 is intended to protect homeowners; and (3) some of the services that it allegedly performed did not require a contractor's license. Phoenix

---

[1] Subsequent undesignated statutory references are to the Business and Professions Code.

2

Pipeline also argues for the first time on appeal that the trial court abused its discretion in denying further leave to amend because Phoenix Pipeline could have amended the complaint to show that it was an *employee* of SpaceX rather than an independent contractor.

With one exception, we conclude that each of these arguments is precluded either by settled law or by Phoenix Pipeline's own previous allegations. In light of the liberal pleading standards applicable to this stage of the litigation, we find that Phoenix Pipeline adequately alleged in its SAC that some of the services it provided did not require a contractor's license. We therefore reverse in part and remand to provide the opportunity for Phoenix Pipeline to amend its complaint to allege claims for noncontractor services only.

## BACKGROUND

Phoenix Pipeline filed its initial complaint on December 29, 2014, asserting claims for breach of contract and breach of the duty of good faith and fair dealing; common counts; intentional and negligent misrepresentation; and unfair business practices. The complaint alleged that in 2010 SpaceX requested that Phoenix Pipeline provide a variety of services, including "plumbing, general maintenance and repair, concrete removal and pouring, trash clean-up and disposal, demolition, car washing, electrical, excavation and installation," all of which the complaint characterized as "Subcontracting Services." The complaint alleged that Phoenix Pipeline provided SpaceX with invoices detailing the services that it provided, and that each such invoice constituted "an individual agreement between [SpaceX and Phoenix Pipeline]."

3

Phoenix Pipeline alleged that SpaceX paid for its services from 2010 to October 2013, but failed to pay for services performed between October 2013 and August 2014.  Phoenix Pipeline claimed that "[o]n or about August 15, 2014, [SpaceX] informed [Phoenix Pipeline] that their services were no longer required and requested [Phoenix Pipeline] to leave [SpaceX's] premises."  Phoenix Pipeline claimed that SpaceX owed $1,037,045.66 for the services it provided.  The complaint did not allege that Phoenix Pipeline was a licensed contractor.

SpaceX demurred on the ground that Phoenix Pipeline was not licensed.  Rather than oppose the demurrer, Phoenix Pipeline elected to file an amended complaint.

Phoenix Pipeline's first amended complaint (FAC) contained essentially the same factual allegations as its initial complaint, but added the allegation that Harold Hill, whom Phoenix Pipeline characterized as the "Responsible Managing Employee" for Phoenix, "oversaw all services that [Phoenix Pipeline] provided to any contractors, companies, or institutions, including [SpaceX]."  The FAC alleged that Hill was the owner of another entity, Phoenix Mechanical Plumbing, Inc. (Phoenix Plumbing), and that he held a California contractor's license, No. 670382.  The FAC alleged that Hill "supervised the Subcontracting Services that [Phoenix Pipeline] provided [SpaceX] for the duration of their relationship."  Phoenix Pipeline attached a copy of contractor's license No. 670382 to the FAC.  The copy showed that the license had been issued to Phoenix Plumbing.

SpaceX filed another demurrer arguing that the license issued to Phoenix Plumbing was not sufficient to satisfy the

4

requirements of section 7031.  On July 13, 2015, the trial court sustained the demurrer with leave to amend.

Phoenix Pipeline filed its SAC on July 23, 2015.  The SAC made two changes to the allegations in the FAC.  First, it relabeled Hill as a "responsible manager officer" rather than as the "Responsible Managing Employee" and expanded the description of his role.  The SAC alleged that Hill "supervised construction related services, managed construction activities by making technical and administrative decisions, checked jobs for proper workmanship, and directly supervised construction job sites."  Second, the SAC distinguished between alleged construction related services, which it categorized as "Subcontracting Services," and alleged nonconstruction related services, which it labeled as "Non-Contracting Services."  The SAC claimed that no valid contractor's license was required for the Non-Contracting Services.

SpaceX again demurred.  Phoenix Pipeline opposed the demurrer, and in the alternative requested 30 days leave to file a third amended complaint.  Phoenix Pipeline's opposition did not explain how it proposed to amend the SAC.  The trial court sustained the demurrer without leave to amend and entered judgment against Phoenix Pipeline on October 21, 2015.

## DISCUSSION

1.    *Standard of Review*

An order sustaining a demurrer is reviewed de novo to determine whether the complaint states a cause of action as a matter of law.  (*Lazar v. Hertz Corp.* (1999) 69 Cal.App.4th 1494, 1501.)  On appeal, we " 'treat the demurrer as admitting all material facts properly pleaded, but not contentions, deductions or conclusions of fact or law.' " (*Blank v. Kirwan* (1985) 39 Cal.3d

5

311, 318.)  However, an appellate court is not required to accept the truth of alleged facts in an amended complaint that are inconsistent with the allegations in a superseded complaint unless the inconsistencies are adequately explained.  (*Owens v. Kings Supermarket* (1988) 198 Cal.App.3d 379, 383–384 (*Owens*).)

When a trial court sustains a demurrer without leave to amend, the court's decision not to permit further amendment is reviewed for abuse of discretion.  (Code Civ. Proc., § 472c, subd. (a); *Ellenberger v. Espinosa* (1994) 30 Cal.App.4th 943, 947.)  If the complaint does not state facts sufficient to constitute a cause of action, the appellate court must determine whether there is a reasonable possibility that the defect can be cured by amendment.  (*Ellenberger*, at p. 947.)

2.      ***Phoenix Pipeline's SAC Fails to State a Claim for Construction Related Services Because It Does Not Allege that Phoenix Pipeline is a Licensed Contractor***

Section 7031, subdivision (a) provides that, with identified exceptions not relevant here:  "[N]o person engaged in the business or acting in the capacity of a contractor, may bring or maintain any action, or recover in law or equity in any action, in any court of this state for the collection of compensation for the performance of any act or contract where a license is required by this chapter without alleging that he or she was a duly licensed contractor at all times during the performance of that act or contract regardless of the merits of the cause of action brought by the person."  Under section 7025, subdivision (b), " 'Person' " includes a corporation.

The purpose of this section is to "protect the public from incompetence and dishonesty in those who provide building and

6

construction services." (*Hydrotech Systems, Ltd. v. Oasis Waterpark* (1991) 52 Cal.3d 988, 995 (*Hydrotech*).) The section "advances this purpose by withholding judicial aid from those who seek compensation for unlicensed contract work." (*Ibid.*)

Our Supreme Court has explained that, in light of the "strength and clarity" of this purpose, "section 7031 applies despite injustice to the unlicensed contractor. 'Section 7031 represents a legislative determination that the importance of deterring unlicensed persons from engaging in the contracting business *outweighs any harshness between the parties*, and that such deterrence can best be realized by denying violators the right to maintain any action for compensation in the courts of this state.' " (*Hydrotech, supra,* 52 Cal.3d at p. 995, quoting *Lewis & Queen v. N. M. Ball Sons* (1957) 48 Cal.2d 141, 151 (*Lewis & Queen*).) The court has interpreted the section strictly to fulfill its purpose. For example, in *Hydrotech*, the court held that section 7031 barred a claim for fraud by a subcontractor against a contractor who was aware that the subcontractor was unlicensed. (*Hydrotech,* at p. 997.) And in *Lewis & Queen*, the court held that a claim by an unlicensed partnership against a contractor was barred, even though one of the partners was individually licensed. (*Lewis & Queen,* at pp. 146, 148–149.) More recently, in *MW Erectors, Inc. v. Niederhauser Ornamental & Metal Works Co., Inc.* (2005) 36 Cal.4th 412 (*MW Erectors*), the court held that, where applicable, section 7031, subdivision (a) bars a person from recovering compensation for *any* work performed under a contract that requires a contractor's license if the person was unlicensed at any time during performance of the contract. (*Id.* at p. 419.)

7

Because Phoenix Pipeline did not allege that it was licensed, section 7031 precludes its claims for work that required a license. None of the arguments that Phoenix Pipeline makes to escape the effect of section 7031 can avoid this result, however harsh.

### a. *Phoenix Pipeline may not rely upon a license issued to another*

Phoenix Pipeline argues that it did not need its own license to maintain its action, as its alleged "Responsible Manager Officer," Hill, was licensed and supervised all the services that Phoenix Pipeline provided.[2] Phoenix Pipeline cites no authority for this proposition, which is inconsistent with settled law.

Section 7031 precludes any unlicensed "person" from maintaining an action for contracting services. Consistent with this provision, the court in *Lewis & Queen* rejected the argument that the partnership that entered into the contract at issue and filed the action did not need a license because one of its partners had an individual license. The court held that "[t]he 'person' that did the contracting work, and was required by section 7028 to have a license . . . was the partnership of Lewis and Queen, and it had no license." (*Lewis & Queen, supra,* 48 Cal.2d at p. 149.)[3]

---

[2] From Phoenix Pipeline's FAC, it appears that the license was actually issued to another entity allegedly owned by Hill, Phoenix Plumbing. However, the ambiguity is irrelevant, as Phoenix Pipeline may not rely on the license to avoid the consequences of section 7031 whether the license was held by Hill or some other entity.

[3] Section 7029 even requires that two licensed partners who engage in a joint venture obtain a separate license for the joint venture. Section 7031 provides for an exception to the requirement of a license to bring suit when contractors are "each

The "person" that contracted with SpaceX and that has filed suit here is Phoenix Pipeline. (See § 7025, subd. (b).) It needed its own license to maintain this action, which it did not have.

*WSS Industrial Construction, Inc. v. Great West Contractors, Inc.* (2008) 162 Cal.App.4th 581 (*WSS*) is directly on point. In that case, Division Eight of this district held that a corporation (WSS) could not maintain an action for contracting services even though its "Responsible Managing Officer" "previously qualified a . . . partnership for a contractor's license and held various individual contractor licenses of his own at all times." (*Id.* at p. 594.) "WSS, the corporate entity or 'person' engaged in the business, which acted in the capacity of contractor, does not and cannot argue *it* was ever licensed as a contractor or held that status at a time that preceded its performance in this case." (*Id.* at p. 596.) Section 7031 therefore precluded its action.

Similarly, in *Opp v. St. Paul Fire & Marine Ins. Co.* (2007) 154 Cal.App.4th 71, the court held that neither the owner of an unlicensed corporation nor the corporation itself could maintain an action for contracting services performed by the corporation despite the fact that the owner was licensed. The contracting entity was the unlicensed corporation, and it could not show that

---

individually licensed under this chapter but who fail to comply with Section 7029." But this express exception, which obviously does not apply here, simply serves to reinforce the Legislature's intention that the "person" that files suit—whether an individual or an entity—must have a license to maintain the action unless a statutory exception exists. (See also § 7075.1, subd. (a) ["No license, regardless of type or classification, shall be transferable to any other person or entity under any circumstances"].)

it complied with section 7031 by virtue of its owner's individual license.  (*Id*. at pp. 76–79.)

Thus, the allegation that Phoenix Pipeline's responsible manager officer was licensed is not sufficient to permit Phoenix Pipeline to sue for work that it contracted to perform.  Phoenix Pipeline was the contracting entity and the entity that filed suit. Its inability to allege that it was licensed is fatal to its claims for compensation for work that required a license.

**b.**     ***Section 7031 is not limited to contracts with unsophisticated persons or homeowners***

Phoenix Pipeline argues that it does not need a contractor's license to sue SpaceX because the "underlying purpose" of section 7031 is to "protect unsuspecting homeowners and not meant to shield sophisticated corporate entities."  The contention is not supported by the language of section 7031 or by decisions applying that section.

Nothing in section 7031 either limits its application to a particular class of homeowners or excludes protection of "sophisticated" persons.[4]  Reading that limitation into the statute would be inconsistent with its purpose of " 'deterring unlicensed persons from engaging in the contracting business.' "  (*Hydrotech, supra,* 52 Cal.3d at p. 995.)  Indeed, in *Hydrotech,* the court rejected the argument that section 7031 should not be applied to

---

[4] The vagueness of such a supposed class reinforces the conclusion that the Legislature would not have intended such a limitation without definition.  Phoenix Pipeline's interpretation of section 7031 would create an unworkable standard.  What should the courts do with a particularly sophisticated homeowner?  How about an unsophisticated small business owner who hires a contractor for a commercial project?

10

a lawsuit by a subcontractor against a contractor because the subcontractor "did not hold itself out to the public." (*Id.* at p. 997.) The court applied section 7031 even though the suit was against a general contractor for a large commercial construction project who allegedly was aware of the subcontractor's unlicensed status. (*Ibid.*) The court declined to find an implied exception in section 7031 for a foreign contractor who allegedly engaged in "isolated" activities in California. (*Id.* at p. 996.)

The holdings in *Hydrotech* and in numerous other cases contradict Phoenix Pipeline's assertion that California courts have only "exacted [the] severe prohibition" in section 7031 "in contractor-homeowner relationships." For example, in *Lewis & Queen,* our Supreme Court applied section 7031 to a suit by a subcontractor against a contractor on a contract for construction of a roadway, noting that "[t]he class protected by the statute includes those who deal with a person required by the statute to have a license." (*Lewis & Queen*, *supra*, 48 Cal.2d at pp. 145, 153.) *WSS* applied section 7031 to a lawsuit by a subcontractor against a contractor for work involving "improvements on a public works project" at a school. (*WSS, supra,* 162 Cal.App.4th at p. 585.) *WSS* cited *Banis Restaurant Design, Inc. v. Serrano* (2005) 134 Cal.App.4th 1035 (*Banis*), which involved a contract for design services for a restaurant and market construction project. (See *WSS* at p. 591; see also *Vallejo Development Co. v. Beck Development Co.* (1994) 24 Cal.App.4th 929, 943–944 (*Vallejo*) [rejecting the argument "that there is less reason to regulate incompetence and dishonesty among master developers than among others who act in the capacity of a general engineering contractor for smaller-scale projects"].)

11

None of the cases that Phoenix Pipeline cites supports its position. Phoenix Pipeline cites *Matchett v. Gould* (1955) 131 Cal.App.2d 821, but our Supreme Court disapproved that case in *Lewis & Queen* to the extent the opinion reasoned that section 7031 did not apply to a suit by a subcontractor against a contractor. (*Lewis & Queen, supra*, 48 Cal.2d at pp. 152–154.) In *Lewis & Queen*, the Supreme Court also distinguished *Norwood v. Judd* (1949) 93 Cal.App.2d 276, *Galich v. Brkich* (1951) 103 Cal.App.2d 187, and *Wold v. Luigi Consenstino & Sons* (1952) 109 Cal.App.2d 854, which Phoenix Pipeline also cites, on the ground that those cases were actions against partners for a share of profits in an unlicensed enterprise, not suits against third parties who contracted with an unlicensed entity. (See *Lewis & Queen*, at pp. 151–152.)

In *Gatti v. Highland Park Builders, Inc.* (1946) 27 Cal.2d 687, both plaintiffs had individual contractors' licenses but formed a partnership that did not have its own license during performance of the contract. The court found "substantial compliance" with section 7031 under circumstances that are now covered by an express exception to the licensing requirement. (*Id.* at pp. 689–690; see §§ 7029, 7031, subd. (a).) Moreover, as the court noted in *WSS,* the judicial substantial compliance doctrine as described in *Gatti* is "no longer the law" in light of legislative changes to codify the doctrine strictly. (See *WSS, supra,* 162 Cal.App.4th at p. 595.)

In *Citizens State Bank v. Gentry* (1937) 20 Cal.App.2d 415, the plaintiff contractor was licensed at the time of the contract but renewed the license while work was still ongoing in the name of a corporation that he owned. Under those facts, the court concluded that "the individual plaintiff in whose name the license

12

stood at the time the contract was made and the corporate entity organized by him in whose name the license stood at the time the cause of action accrued, should be considered as one." (*Id*. at p. 420.) Those facts are not applicable here.

There is no basis to read into section 7031 the limitation that Phoenix Pipeline suggests. Phoenix Pipeline's claim that SpaceX is a sophisticated corporate entity is therefore irrelevant to Phoenix Pipeline's obligation to show that it was licensed.

3. ***Phoenix Pipeline Adequately Alleged that It Provided Some Services for Which No Contractor License Was Necessary***

In a brief argument, Phoenix Pipeline asserts that some of the tasks that it performed were "non-construction related services" and therefore did not require a contractor's license. These tasks, which the SAC labels as "Non-Contracting Services," allegedly included work such as "general maintenance and repair, trash clean-up, hauling, and disposal, and car washing." The SAC distinguishes these services from "construction related services," which it alleges included "plumbing, concrete pouring/removal, excavation, demolition, and electrical."

Phoenix Pipeline's argument raises several questions, including: (1) whether the tasks that Phoenix Pipeline groups in the category of "Non-Contracting Services" actually were nonconstruction related work for which no license was necessary, and (2) whether those tasks can be segregated from other work that Phoenix Pipeline performed that admittedly did require a license. Phoenix Pipeline does not attempt to answer these questions with any analysis or citation to authority. Nevertheless, on review of an order sustaining a demurrer we liberally construe the allegations of the complaint "to attain

13

substantial justice." (*Scientific Cages, Inc. v. Banks* (1978) 81 Cal.App.3d 885, 887 (*Scientific Cages*).)  Applying that standard, we answer these questions in Phoenix Pipeline's favor.

Section 7026 defines a "contractor" as one who undertakes particular tasks.  Performing those tasks requires a license.  (See § 7028 [acting in the capacity of a contractor without a license is a misdemeanor]; *WSS, supra,* 162 Cal.App.4th at pp. 592–593 [preparation of shop plans was included within the scope of section 7026 and therefore required a license].)  And, as discussed, section 7031 prohibits any unlicensed person "engaged in the business or acting in the capacity of a contractor" from maintaining any action for compensation "for the performance of any act or contract where a license is required by this chapter." (§ 7031, subd. (a).)

The scope of the tasks that section 7026 identifies is broad.[5] However, Phoenix Pipeline's SAC identifies several tasks (e.g.,

_____

[5] Under section 7026, the capacity of "contractor" applies to persons who "construct, alter, repair, add to, subtract from, improve, move, wreck or demolish any building, highway, road, parking facility, railroad, excavation or other structure, project, development or improvement, or to do any part thereof, including the erection of scaffolding or other structures or works in connection therewith, or the cleaning of grounds or structures in connection therewith, or the preparation and removal of roadway construction zones, lane closures, flagging, or traffic diversions, or the installation, repair, maintenance, or calibration of monitoring equipment for underground storage tanks, and whether or not the performance of work herein described involves the addition to, or fabrication into, any structure, project, development or improvement herein described of any material or article of merchandise."  Subsequent sections also elaborate upon the definition of a contractor in particular circumstances and

14

"hauling" and "car washing") that might not be included within the scope of work that requires a contractor's license. The invoices attached as exhibit C to Phoenix Pipeline's SAC (which Phoenix Pipeline alleges constitute the agreements governing the Non-Contracting Services that it performed) appear to describe some such services, such as car washing and transporting "tools and material."

We do not attempt to resolve whether Phoenix Pipeline has appropriately identified the tasks that did not require a contractor's license.[6] At this stage of the proceedings, it is sufficient to conclude that a "reasonable interpretation of the agreement[s] between the parties" is that at least some of the work that Phoenix Pipeline performed did not require a license. (*Scientific Cages, supra,* 81 Cal.App.3d at p. 888 [demurrer should have been denied where a "reasonable interpretation" of the agreement between the parties would bring the agreement within the licensing exception for persons who simply supply materials under section 7045]; *Executive Landscape Corp. v. San Vicente Country Villas IV Assn.* (1983) 145 Cal.App.3d 496, 501 [demurrer should not have been sustained, as the contract at issue "can reasonably be interpreted to require Executive to perform work for which no license was required"].)

---

with respect to particular license classifications. (See §§ 7026.1, 7026.2, 7026.3, 7055–7058.)

[6] For example, section 7026 includes in the scope of a contractor's tasks the "cleaning of grounds or structures" in connection with construction. Phoenix Pipeline includes "trash clean up" in the category of Non-Contracting Services. We cannot tell from the SAC whether the "trash clean up" that Phoenix Pipeline performed falls within the scope of section 7026.

15

This leads to the second question as to whether that work can be severed from tasks that admittedly *did* require a contractor's license. Several cases have held that specific tasks that do not require a license may not be carved out of a single contract where those tasks are " 'part of an integrated whole.' " (*WSS, supra,* 162 Cal.App.4th at p. 593 [tasks of ordering anchor bolts and preparing shop drawings could not be severed from the parties' integrated agreement to avoid the license requirement under section 7031], quoting *Banis, supra,* 134 Cal.App.4th at p. 1047.)

However, we are guided again by the standards applicable to reviewing an order sustaining a demurrer. We must accept as true all facts pleaded in the complaint. (*Tameny v. Atlantic Richfield Co.* (1980) 27 Cal.3d 167, 170.) Among Phoenix Pipeline's allegations is the claim that Phoenix Pipeline did work on a "project-by-project basis" and that each invoice that it submitted for the work "constitutes an individual agreement" between SpaceX and Phoenix Pipeline. Phoenix Pipeline included this allegation in each iteration of its complaint.

Thus, Phoenix Pipeline has not alleged one contract, but rather a series of agreements for each separate task that it was asked to perform. It may therefore seek compensation under those alleged agreements that apply to tasks for which no license was required.[7]

---

[7] We therefore need not reach the issue whether there are any circumstances in which tasks performed pursuant to a *single* contract may be segregated between those that require a license and those that do not. (Compare *Johnson v. Mattox* (1968) 257 Cal.App.2d 714, 719 [rejecting the argument that the construction contract at issue was "an entire one and not

16

SpaceX argues that Phoenix Pipeline's argument concerning noncontractor services is precluded by the allegations in the first two versions of its complaint. Those two versions labeled all of the services that Phoenix Pipeline provided as "Subcontracting Services" without distinguishing between those services that required a contractor's license and those that allegedly did not. SpaceX characterizes this label as an "admission" that all the services Phoenix Pipeline performed for SpaceX "were subcontracting services."

We do not find a fatal inconsistency between the use of the label "Subcontracting Services" in prior complaints and the later allegation that some of those services did not require a contractor's license. The factual allegations identifying the particular services that Phoenix Pipeline provided did not change materially; Phoenix Pipeline simply added the allegation that some of those services required a license and some did not. Moreover, the label "Subcontracting Services" does not necessarily imply that all the services included in that category required a contractor's license. "Subcontracting" as used in that label could simply refer to services that were covered by a contract rather than to services that could be performed only by a "contractor" as defined in section 7026. Construing the

---

divisible," and permitting recovery for the sale of a tractor and mowers pursuant to the contract despite the lack of a license] with *The Fifth Day, LLC v. Bolotin* (2009) 172 Cal.App.4th 939, 964 (dis. opn. of Mosk, J.) [to permit an unlicensed contractor to recover compensation for services not requiring a license under the same contract that governs services that do require a license would be inconsistent with the Supreme Court's decision in *MW Erectors, supra,* 36 Cal.4th 412].)

17

allegations liberally, we conclude that Phoenix Pipeline was not precluded from alleging in its SAC that it entered into some agreements with SpaceX for services that did not require a license.

We offer no view as to whether the facts will ultimately support the allegation that Phoenix Pipeline's work was governed by separate agreements for each task, or its claim that some of those tasks required no contractor's license. At this stage of the case, we hold only that Phoenix Pipeline has adequately alleged particular agreements to perform work that did not require a contractor's license. Section 7031 does not bar an action for compensation for such work.

**4. *The Trial Court Acted Within Its Discretion in Declining to Permit an Amendment Alleging that Phoenix Pipeline Was an Employee***

For the first time on appeal, Phoenix Pipeline argues that it could amend its SAC to allege that it was an *employee* rather than a contractor. We need not consider whether this theory is legally viable, as it is inconsistent with Phoenix Pipeline's own allegations.

As mentioned, each version of Phoenix Pipeline's complaint, including its SAC, alleged that Phoenix Pipeline entered into a series of individual agreements with SpaceX to perform particular services. Phoenix Pipeline alleged that each of its invoices memorialized the services that Phoenix Pipeline performed under these agreements. Each of the invoices attached to the complaints stated that it was from Phoenix Pipeline and billed to SpaceX. Thus, Phoenix Pipeline has consistently characterized itself as a contractor and it cannot rely upon the possibility of new, inconsistent allegations to save its

18

claim.  (See *Owens, supra,* 198 Cal.App.3d at pp. 383–384; *Vallejo, supra,* 24 Cal.App.4th at p. 946.)

## DISPOSITION

The judgment is reversed, and the case is remanded to permit further pleading consistent with this opinion.  Each party is to bear its own costs on appeal.

CERTIFIED FOR PUBLICATION


LUI, J.

We concur:


ROTHSCHILD, P. J.


CHANEY, J.

19