Filed 8/28/24  Zale Design Studio v. Leevan CA2/1

# NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION ONE

| | |
|---|---|
| ZALE DESIGN STUDIO,<br><br>　　Plaintiff, Cross-defendant, and Respondent,<br><br>　　v.<br><br>MARK LEEVAN,<br><br>　　Defendant, Cross-complainant, and Appellant. | B324871 consolidated with B326780 and B328264<br><br>(Los Angeles County Super. Ct. No. SC120709) |

APPEALS from a judgment and orders of the Superior Court of Los Angeles County, Craig D. Karlan, Judge.  Affirmed.

Wright Kim Douglas ALC, J. Andrew Douglas, David M. Kim; Lewis Brisbois Bisgaard & Smith LLP, Raul Martinez, Caroline E. Chan, Amy L. Pierce; William S. Brunsten, P.C., William S. Brunsten; Reed Smith, LLP and Raymond A. Cardoza for Defendant, Cross-complainant, and Appellant.

Cohen Williams LLP, Marc S. Williams and Neil S. Jahss for Plaintiff, Cross-defendant, and Respondent.

_____

## INTRODUCTION

Mark Leevan hired designer Linda Zale, doing business as Zale Design Studio, as part of a project to remodel his Beverly Hills home.  Under their agreement, Zale would pick out items such as furniture, paint, carpet, tiles, and fixtures, and Leevan would pay the amount Zale had paid for the items plus 30 percent as a design fee.  Towards the end of the project, Leevan discovered that Zale had billed him for the cost of an item for which she had not paid, became suspicious of other invoices submitted by Zale, and stopped paying her.

Zale sued Leevan to recover what she claimed he owed her for her work on the project.  As an affirmative defense, Leevan asserted that Zale had engaged in activities that required a contractor's license under the Contractors State License Law (CSLL; Bus. & Prof. Code,[1] § 7000 et seq.), and was thus precluded from recovering anything for her services under section 7031, subdivision (a).[2]  It is undisputed that Zale did not have a contractor's license.

_____

[1] All further unspecified code references are to the Business and Professions Code.

[2] Section 7031, subdivision (a) provides, in relevant part, "no person engaged in the business or acting in the capacity of a contractor, may bring or maintain any action, or recover in law or equity in any action, in any court of this state for the collection of compensation for the performance of any act or contract where a

Leevan also filed a cross-complaint, asserting a claim under section 7031, subdivision (b) to have Zale disgorge all payments Leevan had made to her on the ground she had engaged in activities requiring a contractor's license.[3]  Leevan also asserted other cross-claims, including under the Racketeer Influenced and Corrupt Organizations Act (RICO; 18 U.S.C. § 1962), asserting that Zale had fraudulently overcharged him.

The matter proceeded to trial, and the jury returned a special verdict finding that Zale had not engaged in any acts requiring a contractor's license.  The jury awarded Zale $64,000 on her breach of contract claim; it awarded Leevan nothing on his claims.  The trial court later granted Zale's motion for attorney's fees under a prevailing party provision in the parties' contract.

Leevan now appeals, arguing that the evidence shows Zale did in fact engage in activities that required a contractor's license, a mechanic's lien Zale recorded before the lawsuit constituted a binding admission by Zale that she acted as a contractor, the trial court erroneously instructed the jury on the scope of section 7031, and Zale's counsel misstated the law during his closing arguments.  Leevan also challenges the attorney's fee award.

We find no prejudicial error and affirm.

---

license is required by [the CSLL]," without having a contractor's license.

[3] Section 7031, subdivision (b) provides, with an exception not relevant here, "a person who utilizes the services of an unlicensed contractor may bring an action in any court of competent jurisdiction in this state to recover all compensation paid to the unlicensed contractor for performance of any act or contract."

3

## FACTUAL AND PROCEDURAL BACKGROUND

Although this case concerns a dispute over whether Zale was owed approximately $74,000 or had to refund to Leevan approximately $315,000, it has generated an inordinately voluminous record, including over 5,000 pages in the parties' appellate appendices and eight volumes of reporter's transcript. We need not, however, summarize the entirety of such a large record to address the issues presented on appeal. Consistent with the applicable standard of review, we set forth the substantial evidence supporting the jury's verdict. (*Schmidt v. Superior Court* (2020) 44 Cal.App.5th 570, 581-582.) However, where relevant to our discussion of Leevan's challenges to the judgment, we note contrary evidence.

### A. Leevan's Home Remodel Project

Leevan decided to remodel his house and hired Jonathan Silberman as the general contractor and Ward Jewell as the architect. Leevan hired Zale as a designer. Leevan also directly hired some subcontractors. Later, almost at the end of the project, Leevan hired Bob Krumpe to act as an "owner's rep[resentative]."

Silberman was a licensed contractor who worked on the entire project. He hired subcontractors for electrical work, plumbing, heating and air conditioning, roofing, pool work, and marble installation. Silberman would pay the subcontractors he hired and charge enough for the work so that he could make a profit. Silberman did not charge Leevan for the work of subcontractors Silberman did not hire. Silberman was "responsible for scheduling" and for supervising the work of the subcontractors he had hired.

4

Jewell was a licensed architect who designed the remodeled home and created drawings for the contractor; he also made sure the house complied with city and state code requirements, and was responsible for obtaining permit approval. Jewell was onsite to observe the construction, but he did not supervise it as that would have required him to be onsite all the time. Jewell was paid 12 percent of the cost of construction based on the cost provided by the contractor.

Krumpe monitored the construction and acted as a liaison between Leevan and the various people working on the project.

## B. Zale's Contract with Leevan

Zale and Leevan entered into a written contract, which consisted of a February 18, 2011 letter prepared by Zale setting forth her "proposal to perform interior design services," and an attached preprinted form of "general terms and conditions" (capitalization omitted). The contract provided, "[u]pon selection and design approval, Zale Design Studio will procure for client[] all of the tangible materials relating to the overall design scheme notated. These items . . . include hardwood flooring, broadloom carpet, ceramic and stone tile, stone slabs, window treatments, decorative light fixtures, hardware, plumbing fixtures, appliances, furniture and any specialized subcontracted work (i.e.: wall covering installation, window treatment installation, carpet installation, special paint and finish artists, etc.)."

The contract set forth the scope of Zale's services in two sections. The first, "[o]verall [d]esign [s]cheme/[i]nterior [d]esign [d]etails," covered "design" and/or "selections" for 13 elements of the interior, including "[f]looring material," "[f]loor covering," "[w]oodwork," "[p]aint color and finish," "[w]indow treatment," and furniture. The second section, "[e]xterior [d]esign," covered

5

"[f]ront garden landscape design and plantings," and "[b]ack garden patio area furniture."

The contract included a section titled, "[c]onstruction [s]upervision," which listed four items Zale was to perform: "[r]eview contractor bids with client[] as required," "[c]onsultation meetings with client[], architect [and] contractors," "[o]bserve work and subcontractors throughout the job," and "[a]ttend jobsite meetings per client and architect's schedule." Zale testified "[c]onstruction [s]upervision," as used in the contract, meant "observing and being a part of the design process. So all of those [four items] aren't really supervision. They are just, you know, being a part of the design process on the job."

Zale explained the four services listed in the "[c]onstruction [s]upervision" section of the contract as follows. "Review contractor bids" related to "anything that had to do with the aesthetics of the job, any bids that Mr. Leevan might receive, I would review them to make sure that they were accurate in accordance with the design."

"Consultation meetings with clients, architect and contractors" referred to meetings "to consult over design ideas."

As for "[o]bserve work and subcontractors throughout the job," Zale testified she would observe subcontractors performing and inform Silberman if the execution did not match her design vision. She gave the following example: "So, say, I designed the tile in the bathroom and the installer—[Silberman]'s tile installer would install per my pattern so the pattern that I designed was on the architectural drawings. So by observing his work, I made sure that I liked the grout joint, tiles weren't crooked, the pattern went in correctly, where to start and where to finish, if you centerline and move out or you start at the corner and move

over."  If Zale observed and noticed an issue with installation work by someone she had hired, she would address the issue herself.

Silberman described Zale as "the designer" on the project, who would "monitor" installation of items and communicate with him about "the finished product that she wanted, how she wanted it to look."  According to Silberman, Zale did not communicate with him about the "means and methods" of the construction. The contract limited Zale's responsibilities with respect to construction and subcontractors, stating, in relevant part:  "Zale shall not have control over, or charge of, and shall not be responsible for construction means, methods, techniques, sequences or procedures . . . ."  According to Zale, this made clear she was not a contractor, as she did not have a contractor's license.

Lastly, according to Zale "[a]ttend jobsite meetings" referred to the weekly meetings with Silberman, Jewell, Krumpe and Leevan, which she would attend "to offer any suggestions . . . design-wise."  The participants would look at the work that had been done the prior week and discuss what Silberman planned for the upcoming week.

Under the contract, Zale was to be paid $150 per hour for "time spent on the overall design scheme, selections and design drawings," and for attending meetings.  In addition, she was to provide the materials she selected "on a designer net cost plus 30 [percent] basis," meaning she would charge Leevan for her cost for obtaining an item plus a 30 percent markup.  Zale and Leevan both testified Zale was also entitled to her 30 percent fee on the cost to install an item or material she had selected or designed even where she did not arrange or pay for the installation.

7

**C.     Zale's Role in the Remodel**

At trial, Leevan claimed that Zale had engaged in activities which required a contractor's license with respect to four aspects of the project: hardwood floors, window coverings, cushions on a banquette bench, and bathroom cabinets.

1.     *Hardwood Floors*

Hardwood floors were installed in several areas of the house. Zale selected the type of wood, created the stain, chose the size of the planks, designed the orientation of the planks, and chose the finish.

Zale got bids for the wood flooring from two vendors, but Leevan felt the bids were too high. Zale then suggested Jose Ruiz's name. Zale prepared Ruiz's proposal for him because he was not fluent in English. Ruiz came up with the price. Zale reviewed Ruiz's bid to ensure it correctly specified walnut wood and to calculate her design fee.

Ruiz's bid was $2,000 lower than a bid submitted by Silberman, and Leevan accepted Ruiz's bid because it was the least expensive. Leevan hired Ruiz and paid Ruiz $35,750 for the cost of the wood and the installation labor. Zale did not have a contract with Ruiz or pay him.

Silberman, Leevan, and Krumpe were responsible for scheduling the construction. Zale communicated the schedule to Ruiz because she was his contact for Leevan's project. According to Zale, she did not direct Ruiz's installation of the hardwood floors. Zale did observe Ruiz when he applied the stain to make sure it looked right.

Zale billed Leevan a design fee of $11,250 based on the amount Ruiz charged.

Ruiz did not have a contractor's license. Neither Zale nor Leevan asked him if he had a license.

2. *Window Coverings*

Zale designed window coverings, including Roman shades,[4] and hired and paid Anton's Decorator Workroom (Anton's) to make and install the items. Zale charged her 30 percent fee based on the invoice from Anton's.

Anton's hired Jose Lucero to install the window coverings. Teresa Iizuka, Anton's owner, testified that the window coverings were attached by screws. The curtains were hung on rods held by brackets screwed into the wall. The Roman shades had wooden boards on top which were either screwed into the ceiling or attached with L brackets to the wall. The brackets were attached by screws. According to Iizuka, all of the window coverings were "removable."

The two Roman shades in the master bathroom were motorized. The motors are attached to a piece of wood which is either screwed into the ceiling or attached to a wall with L brackets. Silberman hired an electrician to connect the motor to a wire sticking out of the wall; the electrician also installed a switch provided by Anton's.

Anton's did not have a contractor's license. Iizuka believed that Anton's did not need a contractor's license "[b]ecause everything we install in terms of drapery and shades are removable items."

---

[4] Roman shades "are window coverings that go up and down."

### 3. *Banquette Cushions*

Zale picked the material for cushions on a banquette[5] in the kitchen—leather for the seat cushions and fabric for the back cushions. Zale paid A.P. Smiley & Sons to make the cushions and install them on the banquette. Zale testified that the cushions "are fixed, but they are removable. Imagine sliding in [to sit down on the cushion] with a pen in your pocket and ripping the leather. It's very easy to take the seat [cushion] out, reupholster it, put it back in. Same with the back." Zale submitted an invoice to Leevan for A.P. Smiley & Sons' labor to make and install the cushions plus her design fee.

Vince Paldino installed kitchen cabinets and the banquette, which was "built-in" and made of the same wood as the cabinets. Leevan hired Paldino to install the cabinets and the banquette and paid Paldino directly. Zale charged Leevan 15 percent of Paldino's work on the cabinetry and paneling, which Zale had designed.

### 4. *Bathroom Vanities*

Paul Einsiedler, who owned and operated L.A. Woodworks, Inc. (L.A. Woodworks), built cabinets for Leevan's bathrooms. Zale paid for the bathroom cabinets and charged Leevan.

Paldino installed the bathroom cabinets, and a plumber hired by Silberman cut holes for the plumbing.[6] Leevan paid Paldino for installing the bathroom cabinets.

---

[5] Zale described a "banquette" as "a continuation of the cabinetry, but you can sit on it."

[6] Both Zale and Leevan testified that Paldino installed the bathroom cabinets. Zale also introduced an e-mail from Paldino

10

## D.     Leevan Stops Paying Zale's Invoices

A plumbing supply company reported a balance due on a sink which Zale previously claimed to have paid for when she invoiced Leevan.  Leevan learned from the supplier that Zale had not paid for the sink, and he confronted Zale.  Leevan then asked Zale for all of her invoices from the supplier.  Zale provided some invoices from the plumbing supplier, but not all.  Leevan then asked Zale for copies of all original invoices from all vendors.  Leevan testified that he hired attorneys to look through materials he received from Zale, and they found discrepancies between her invoices and those of her vendors.

At some point near the end of the project, after the incident with the plumbing supplier receivable, Leevan stopped paying Zale's invoices.

The remodeling work was completed around Thanksgiving of 2012.

---

indicating he had installed the bathroom cabinets.  There was evidence to the contrary, however, as Einsiedler testified that L.A. Woodworks installed the bathroom cabinets, and he was present during the installation.  Einsiedler, who held a general contractor's license, testified that in prior projects Zale had hired and paid him to install custom cabinetry.  On cross-examination, Zale's counsel asked, "Do you remember doing the installation?" and Einsiedler responded, "I don't specifically recall doing it, but it would seem highly unusual if we did not."  Zale testified that she did not pay $500 of L.A. Woodworks' invoice because it was for installation, and the installation was handled by someone else, although she did not adjust her charge to Leevan accordingly.  Einsiedler agreed that Zale had deducted $500 from his invoice, which was the cost of installation, and did not recall whether Zale paid him for installation.

11

## E.     Zale Records a Mechanic's Lien

Zale's attorneys recorded a mechanic's lien against Leevan's home for $80,816.75 which Leevan had allegedly failed to pay Zale.  Zale signed the lien and a verification on May 8, 2013.[7]  Zale followed her attorneys' advice in having the lien recorded.

## F.     Zale Sues Leevan

Zale sued Leevan on May 13, 2013, and in her operative second amended complaint (filed on September 5, 2014) she sought to recover $73,864.74 in unpaid invoices.[8]  She asserted claims for breach of contract, common counts, foreclosure of mechanic's lien, quantum meruit, and declaratory relief.

## G.     Leevan Files a Cross-complaint Against Zale, Several Subcontractors, and Zale's Parents

Leevan filed a cross-complaint against Zale on June 27, 2013.  In his operative first amended cross-complaint (filed on August 13, 2014) Leevan asserted claims for RICO violations,

---

[7] In Leevan's appendix the mechanic's lien purportedly admitted at trial was signed by Zale on April 18, 2013, and bore no markings it had been recorded.  This appears to be an error as the testimony of both Zale and Leevan refers to the May lien.  Zale's appendix contains the May 8, 2013 lien, which shows it was recorded.  In any event, there do not appear to be any material differences in the two liens, although the description of the services Zale provided was more detailed in the May version.

[8] The second amended complaint acknowledged that the amount of Zale's mechanic's lien was higher than the amount sought in the complaint, and stated, "Since the filing of the lien, Z[ale] has determined that additional credits and offsets should be deducted from this total."

fraud, unlicensed contracting under section 7031, subdivision (b), negligence, breach of contract, and fraudulent transfer. In his unlicensed contracting claim, Leevan sought disgorgement of all the money he had paid to Zale on the project. Leevan named Zale and her parents as defendants on the fraudulent transfer claim.[9]

## H.     Pretrial Activity

In January 2015, Leevan recorded a lis pendens on Zale's home. He withdrew the lis pendens in February 2017. Leevan also dismissed Zale's parents from the case, although the record does not include the date of the dismissal. The trial court sustained a demurrer to Leevan's RICO cause of action without leave to amend on July 31, 2015.

Zale dismissed her mechanic's lien claim on December 4, 2018, and recorded a release of the lien on December 7, 2018.

In September 2019, Leevan moved for summary adjudication seeking dismissal of Zale's breach of contract claim and judgment in his favor on his cross-claim under section 7031, subdivision (b) on the ground that Zale allegedly had engaged in acts requiring a contractor's license. The court denied Leevan's motion, ruling "Zale has raised a triable issue of material fact as

---

[9] Leevan also sued several subcontractors, including Ruiz, A.P. Smiley & Sons, and Anton's. Before trial, Leevan dismissed his claims against A.P. Smiley & Sons and Anton's, and obtained a summary judgment against Ruiz. Ruiz did not appeal; the grounds for the judgment against him are not relevant to our resolution of this appeal, so we do not further discuss them.

to whether she was engaged in work that required a contractor's license."[10]

## I.    Trial

### 1.    *Evidence Regarding the Parties' Billing Dispute*

The case was tried to a jury on April 19-21, and 25-29, 2022.  Zale, Leevan, Silberman, Iizuka, Ruiz, Jewell, and Einsiedler testified.

We summarized above evidence regarding Zale's role in the remodeling project, and the work done by Ruiz, Anton's, A.P. Smiley & Sons, and Einsiedler, that was presented at trial.  In addition, the parties adduced the following evidence regarding Zale's invoices to Leevan and Leevan's payments.

Zale admitted that she overcharged Leevan a total of $16,762.60.  This included a $2,000 " 'rebate' " she received from the appliance supplier as a "designer incentive"—she received the rebate when she went to pay the balance due on appliances, and she did not credit Leevan for the reduced price.  Zale similarly did not credit Leevan for a discount she received on a mirror.  Zale received lampshades for free but charged Leevan for the price originally quoted by the vendor.  Zale also did not give Leevan credit when she changed the orientation of the carpeting, which resulted in a lower price, or when she decided to utilize less expensive fabric for a headboard.[11]  Zale charged extra for

---

[10] Leevan filed a petition for writ of mandate regarding this ruling, which this court summarily denied.  (*Leevan v. Superior Court* (Aug. 11, 2021, B312450).)

[11] As to the overcharge on the fabric, Zale testified, "It was give and take.  Some things came in higher than I, you know,

14

custom made chairs because they required substantial work and she felt the price being charged was low.

In December 2012, in response to the demands of Leevan and his attorneys that she substantiate her invoices, Zale provided them with a reconciliation spreadsheet and vendor invoices. Zale felt under pressure because Leevan had stopped paying her invoices. Zale testified that, in order to hide the overcharges from Leevan and his attorneys, she falsely manipulated some of the vendor invoices to make the numbers match.[12] This included altering some vendor invoices, and fabricating others.

Zale introduced into evidence a revised reconciliation spreadsheet which listed the proper amount due for each item and the amount paid, as well as her charge for her time and what Leevan paid. The document showed that Leevan had paid $571,438.21, and still owed $68,776.46. Zale testified that the revised amount due did not include any amounts she had overcharged Leevan. She also testified that Leevan was entitled to $10,562.70 in other credits which was reflected in the revised amount due, and that she had undercharged Leevan a total of

---

estimated and I paid more, and sometimes things came in lower. So it was really—to me, it was just a give and take of—you know, whatever was on the proposal, I thought, was what he agreed to, and that's why I charged him that way."

[12] Zale also testified she knew that some of the charges she was claiming on her mechanic's lien were "false and fabricated."

$7,622.58 for various items and the revised amount due reflected the correct (higher) amount for these items.[13]

Zale identified several specific charges Leevan had failed to pay, including more than $15,000 for window coverings, more than $23,000 for furniture, about $5,000 of Zale's design fee on the hardwood flooring, and about $15,000 for Zale's time for 109 hours of meetings.

Leevan testified that under their contract, Zale could not invoice him for a charge he had not pre-approved. According to Leevan, Zale submitted several invoices near and after the end of the construction work for charges he had not approved, including a $3,005.60 invoice for pick up, delivery and installation of furnishings and a $2,306.98 invoice for storage and release of furniture.

Evidently relying on his claim that Zale was not entitled to payment for acting as a contractor without a license, Leevan testified he was "agreeing to pay for" "[a]ppliances and furnishings," but not for "fixture[s]" or appliances that were not removable.

2.  *Jury Instructions*

As relevant here, the trial court instructed the jury as follows regarding Leevan's claim that Zale had engaged in activity requiring a contractor's license.

a.  Instructions referencing "incidental" services.

Special instruction No. 14 addressed Leevan's affirmative defense under section 7031, subdivision (a), and stated: "No

---

[13] Zale testified that she had incorporated the opinions of Leevan's forensic accounting expert, Wesley Nutten. Leevan decided not to have Nutten testify.

16

person engaged in the business or acting in the capacity of a contractor may bring or maintain any action, or recover in law or equity in any action, in any court of this state for the collection of compensation for the performance of any act or contract where a license is required without alleging that they were a duly licensed contractor at all times during the performance of that act or contract regardless of the merits of the cause of action brought by the person, unless the contractor services they performed were incidental to the parties' overall business relationship."

The language of this instruction tracked the language of section 7031, subdivision (a), except the last clause setting forth an "incidental" services exception that the trial court added based on Zale's argument that caselaw had recognized such an exception. Leevan objected to this instruction.

Special instruction No. 2 stated: "A claim for recovery of payments to an unlicensed contractor under Cal. Bus. & Prof. Code § 7031(b) is not established if Ms. Zale performed services as an unlicensed contractor but those services were incidental to the parties' overall business relationship." Leevan objected to this instruction on the ground it was not legally supported.[14]

> b. Instructions concerning licensure requirement.

Special instruction No. 3, based on section 7045, stated: "A contractor's license is not required for the sale or installation of any finished products, materials, or articles of merchandise that do not become a fixed part of the structure or for a material supplier or manufacturer furnishing finished products, materials,

---

[14] The trial court rejected Leevan's proposed instruction, based on section 7048, defining incidental contractor services as work costing less than $500.

or articles of merchandise who does not install or contract for the installation of those items."[15]

Special instruction No. 4, based on section 7052, stated: "A contractor's license is not required by any person who only furnishes materials or supplies without fabricating them into, or consuming them in the performance of, the work of the contractor."

Special instruction No. 10, based on Civil Code section 660, stated: "A fixture is a thing that is deemed to be affixed to land when it is permanently attached to what is thus permanent, as by means of cement, plaster, nails, bolts, or screws."[16]

Special instruction No. 12 regarding "[c]ontractor [l]icense [c]lassifications" began, "Although the Contractors State License Board has issued the following licensing classifications, whether someone is required to have a contractor's license is still subject to the exemptions as stated elsewhere in the Court's instructions." The instruction later stated, in relevant part, "A D-52 license is required to be a window coverings contractor. A window coverings contractor installs or applies decorative, architectural/functional window/glass treatment or covering products, including but not limited to the following: all types of materials and fabrics that make up louvers, shutters, Venetian and mini-blinds; residential or commercial draperies and screens;

---

[15] Leevan objected to special instruction No. 3, apparently arguing there was no factual support for it because "Zale is not just a material supplier as she hired and paid some of the subcontractors."

[16] Zale objected to this instruction on the ground it conflicted with special instruction No. 3 and section 7045.

18

expanded metal window and door guards; plastic film window treatment and/or any other window treatment applied for temperature control or as a screening device."

### c.    Instruction on mechanic's lien.

Special instruction No. 15 described a mechanic's lien: "A mechanic's lien may be filed by a person that provides work authorized for a work of improvement, including, but not limited to: (a) a direct contractor; (b) subcontractor; or (c) material supplier. Work is authorized for a work of improvement if: (a) it is provided at the request of or agreed to by the owner; or (b) it is provided or authorized by a direct contractor, subcontractor, architect or other person having charge of all or part of the work of improvement. A material supplier means a person that provides materials or supplies to be used or consumed in a work of improvement. A work of improvement includes constructions [*sic*], alteration[,] repair, in whole or in part, of, or addition to, a building."

### 3.    *Closing Arguments*

In his closing argument, Zale's counsel mentioned several items for which Leevan had not paid (or paid only the deposit), referred the jury to the revised reconciliation spreadsheet Zale had prepared showing a balance due of $68,776.46, and requested the jury award her $68,000. Counsel asserted that Zale had given Leevan credit for all of the overcharges in her reconciliation, so that the net amount due to her was approximately $68,000.

Zale's counsel denied that Zale had acted as an unlicensed contractor with respect to the window coverings, the hardwood flooring, the bathroom cabinets, and the banquette cushions. He argued that under special instruction No. 3, the installation of

19

the window coverings did not require a contractor's license because they were simply screwed in and thus did not become a fixed part of the structure. He asserted that the window coverings were not "fixtures" as defined in special instruction No. 10 because they were removable, and that Anton's was not responsible for hooking up the motors to the electrical system. Counsel argued that Paldino, not Einsiedler, installed the bathroom cabinets, and therefore Zale was not required to have a contractor's license to hire Einsiedler. With respect to the hardwood floors, counsel argued that Leevan hired Ruiz and that Zale did not supervise Ruiz's work. Counsel argued that no contractor's license was required to install the banquette cushions because the cushions did not become a fixed part of the structure and were removable and thus not considered "fixtures." Lastly, counsel argued that, even if the jury concluded Zale had done some work which required a contractor's license, the work fell under the "incidental services" exception.

In his closing argument, Leevan's counsel asserted that Zale had not presented evidence that the $68,000 she claimed was owed was for items that had been proposed to and accepted by Leevan. He also argued that Zale was not entitled to her design fee based on Ruiz's flooring work because Leevan ultimately paid nothing for the work. Counsel argued that Zale was not entitled to her fee on Anton's work because Anton's acted as an unlicensed contractor, or on A.P. Smiley & Sons' work installing the banquette cushions for the same reason. Counsel indicated that Leevan was defrauded out of $28,686 through false billing. As for the amounts Leevan was seeking to be disgorged because Zale was an unlicensed contractor, counsel indicated that Leevan was not seeking the return of any amounts he had paid

20

Zale for furniture or appliances, which counsel later indicated was $256,765.61, so that Leevan was seeking disgorgement of the amount he had paid ($571,438.21) minus $256,765.61, which equaled $314,672.60.

Leevan's counsel argued that Zale had acted as an unlicensed contractor by submitting Ruiz's bid to install the flooring and supervising Ruiz's work. Counsel also argued that Zale's contracting activities were not merely "incidental" to her work for Leevan because she was submitting bids and supervising work "and acting like a contractor," and because the items that were installed were important and necessary parts of the construction. Leevan's counsel argued that the proper standard for determining a "fixture" was not whether it was "removable," and custom window coverings and a cushion for a custom banquette are "fixtures." He similarly argued that the bathroom cabinets were fixtures and that Einsiedler had installed them. Counsel further argued that the regulations requiring specialty contractor's licenses showed that Anton's was doing work which required a contractor's license.

Leevan's counsel also argued that by recording a mechanic's lien, Zale admitted that she was either a contractor or supplied items that became part of the construction.

Leevan's counsel lastly argued that the parties' contract showed Zale was acting as a contractor because it required her to perform " 'construction supervision.' "

4. *The Jury's Verdict*

The jury reached a verdict on April 29, 2022. As reflected on the special verdict form, the jury found that the parties had entered into a contract, Zale had performed her portion of the contract but Leevan had breached the contract, and Zale did not

21

"perform services that required a contractor's license." Based on this response, the jury was instructed to skip the next question (No. 6), which asked, "Were the contractor services that Linda Zale performed incidental to the parties' overall business relationship?"[17] The jury awarded Zale $64,000 for breach of contract. To the extent one can discern the reason(s) for the jury awarding $64,000 rather than the $68,000 Zale requested, it does not appear to relate in any way to the issues presented in this appeal.

As to Leevan's disgorgement claim under section 7031, subdivision (b), the jury found that Zale did not "perform services . . . that required a valid contractor's license" with respect to "the hardwood floors," "the bathroom cabinets," "the window coverings," or "the banquette cushioning." Given these responses, the jury was instructed to skip the remaining special verdict questions on this claim, including question No. 3 which asked, "Were the contractor services that Linda Zale performed incidental to the parties' overall business relationship?"

The jury found that Zale had committed intentional misrepresentation but that it caused Leevan no damages. The jury found that Zale did not commit negligent misrepresentation.

On August 30, 2022, the trial court entered a judgment on the jury's verdict.[18]

---

[17] Leevan had objected to including questions about the "incidental services" exemption on the special verdict form. The court decided to include those questions over Leevan's objection.

[18] Leevan filed posttrial motions for new trial and judgment notwithstanding the verdict which the trial court denied. Leevan filed a notice of appeal from the ruling on these

22

**J.    Zale's Motion for Attorney's Fees**

Zale filed a posttrial motion for attorney's fees under a prevailing party attorney's fees provision in the parties' contract. Zale sought $1,843,403, based on a lodestar of $1,568,501, plus $274,902 reflecting a 1.5 multiplier for the fees incurred from about June 15, 2021 onwards when Zale's attorneys began working on a partial contingency fee basis. Zale contended that her fees were reasonable in light of Leevan's aggressive litigation tactics, and noted that Leevan had rejected two offers Zale had made under Code of Civil Procedure section 998, including one in May 2021 in which she offered to pay Leevan $100,000. Zale argued that the attorney's fees clause was broad enough to cover the fees she incurred to pursue her breach of contract claim as well as those incurred to defend against Leevan's fraud and disgorgement claims, and the issues involved in the various claims were all inextricably intertwined.

Zale supported her motion with her own declaration, and declarations from her current and former counsel with attached billing statements. Zale did not include in the lodestar $51,763.50 in fees for work related to the defense of a possible criminal case against Zale, proceedings before the Contractors State License Board, and the defense of Zale's parents, and also did not include various types of billing such as for administrative work.

In his opposition, Leevan contended the litigation resulted from Zale's acts, including her fraudulent billing, her recording of

motions but makes no argument in his briefs regarding them. He has therefore waived any claim of error related to the court's ruling on those motions. (E.g., *Estrada v. Public Employees' Retirement System* (2023) 95 Cal.App.5th 870, 889.)

an improper mechanic's lien, and her failure to mediate as required by the contract. He argued that the court should not award Zale fees related to defending against the fraud claim or to her mechanic's lien claim. Leevan contended that Zale refused to admit her fraud until trial, requiring him to litigate the issue.

Leevan argued that Zale's lodestar amount was unreasonable because it was 24.5 times the amount of the jury award. In addition, he submitted a declaration from an expert who opined that the attorneys' bills were unreasonable for various reasons, including excessive intra-office conferences, round number billing, block billing, vague descriptions of tasks, billing for clerical work, billing for the attendance of two attorneys at a deposition and at trial, and excessive time spent on tasks. The expert also identified, through a word search of the billing statements, the attorney's fees he opined should be deducted as related to Leevan's fraud claim and to Zale's mechanic's lien claim.

Leevan argued that approximately $945,000 should be deducted from Zale's lodestar, that no multiplier was warranted, and that therefore Zale should recover, at most, approximately $625,000 in fees.

Zale filed a reply in which she set forth a revised lodestar of $1,699,031 to include fees billed after the attorney's fees motion was filed. Zale also contended that the contract did not require the parties to mediate as a precondition to recovering fees, and that in any event Zale had agreed to mediate before filing her complaint. Zale also asserted that the analysis of Leevan's expert was flawed in many respects.

The court heard the motion on December 14, 2022, and took it under submission. On January 17, 2023, the court granted the

24

motion and awarded Zale $1,568,501 as a lodestar amount without any multiplier. The court found that the contract did not require the parties to mediate in order to recover their fees, and that Zale had agreed to mediate before filing her complaint. The court found it was proper to award Zale's fees on Leevan's fraud claim because Leevan did not recover on his claim, and it was unable to separate out the fees related to Zale's mechanic's lien claim. The court noted the criticisms of Leevan's billing expert, but stated it had "reviewed the billing statements and [found] the fees to be proper." The court found, "the mere contingent nature of the work [was] insufficient to justify application of a 1.5 lodestar multiplier for the time frame requested."

On February 22, 2023, the court entered an amended judgment to include the damages award, the attorney's fees award, $59,195.23 in prejudgment interest, and $71,500.21 in costs, for a total of $1,763,196.44.

## DISCUSSION

Leevan challenges the jury's verdict, and the resulting judgment, on four grounds. First, he contends that the evidence adduced at trial showed that Zale acted as a contractor under the terms of the parties' contract, and through her work with Anton's, Ruiz, A.P. Smiley & Sons, and L.A. Woodworks. Second, he contends that Zale made a judicial admission that she had engaged in activities requiring a contractor's license by recording her mechanic's lien. Third, Leevan argues the trial court erred by instructing the jury on Zale's theory that her lack of a contractor's license did not preclude recovery for services requiring such a license if the services were "incidental" to the parties' business relationship. Fourth, Leevan asserts we should

25

reverse the judgment due to improper closing arguments by Zale's counsel.

Leevan also challenges the trial court's award of attorney's fees to Zale on various grounds.

## A.  Substantial Evidence Supports the Jury's Verdict

### 1.  *Standard of Review*

 "When a party contends insufficient evidence supports a jury verdict, we apply the substantial evidence standard of review.  [Citation.]  ' "[T]he power of [the] appellate court *begins* and *ends* with the determination as to whether there is any substantial evidence contradicted or uncontradicted which will support the [verdict]." [Citations.]' [Citation.]  We must 'view the evidence in the light most favorable to the prevailing party, giving it the benefit of every reasonable inference and resolving all conflicts in its favor . . . .' [Citation.]" (*Wilson v. County of Orange* (2009) 169 Cal.App.4th 1185, 1188.)

Leevan contends that our review of the judgment should be de novo, because it was undisputed what work Zale contracted to perform, and the application of the relevant statutes to that work presents a question of law.  We are not persuaded.  The parties' contract was ambiguous regarding the nature of the services Zale was to provide and thus whether they required licensure, and "when, as here, ascertaining the intent of the parties at the time the contract was executed depends on the credibility of extrinsic evidence, that credibility determination and the interpretation of the contract are questions of fact that may properly be resolved by the jury [citation]." (*City of Hope National Medical Center v. Genentech, Inc.* (2008) 43 Cal.4th 375, 395.)  Evidence about the course of performance under the parties' contract is also relevant to resolving contractual ambiguities.  (Code Civ. Proc., § 1856,

subds. (a), (c) [the terms of "a writing intended by the parties as a final expression of their agreement with respect to the terms included therein . . . [¶] . . . [¶] . . . may be explained or supplemented . . . by course of performance"]; *Employers Reinsurance Co. v. Superior Court* (2008) 161 Cal.App.4th 906, 920-922 [discussing admissibility of course of performance evidence].) Similarly, what services Zale actually provided, and the nature of the work her subcontractors performed, was disputed at trial. Substantial evidence review therefore applies. (See *Doe v. Roman Catholic Archbishop of Cashel & Emly* (2009) 177 Cal.App.4th 209, 218 [substantial evidence review applied despite the "plaintiff assert[ing] in his opening appellate brief that the facts were *not* in conflict, calling for our independent review"].)[19]

    2.    *The CSLL*

The CSLL "governs construction business in California in a manner intended to ' " 'protect the public from incompetent or dishonest providers of building and construction services. [Citation.]' [Citation.]" ' [Citation.] The CSLL requires all contractors 'be licensed unless exempt.' [Citation.]" (*Manela v. Stone* (2021) 66 Cal.App.5th 90, 102.) "The California courts have also long held that those who enter into construction

_____

[19] *Vallejo Development Co. v. Beck Development Co.* (1994) 24 Cal.App.4th 929, upon which Leevan relies, is inapposite because the appeal in that case was taken from an order granting a demurrer, and thus the allegations of the complaint were accepted as true. (*Id.* at pp. 934-935, 937.) Furthermore, it was undisputed in *Vallejo Development Co.* that the plaintiff did work that required licensure. (*Id.* at p. 939.) Here, that issue was very much disputed.

27

contracts must be licensed, even when they themselves do not do the actual work under the contract." (*Vallejo Development Co. v. Beck Development Co.*, *supra*, 24 Cal.App.4th at p. 941.)

The primary enforcement mechanism for the licensure requirement is section 7031. As previously noted, under section 7031, subdivision (a), "no person engaged in the business or acting in the capacity of a contractor, may bring or maintain any action, or recover in law or equity in any action, in any court of this state for the collection of compensation for the performance of any act or contract where a license is required by this chapter," unless they hold such a license. In addition, under section 7031, subdivision (b), with an exception not relevant here, "a person who utilizes the services of an unlicensed contractor may bring an action in any court of competent jurisdiction in this state to recover all compensation paid to the unlicensed contractor for performance of any act or contract."

The CSLL, in section 7026, defines "[c]ontractor," in relevant part, as "any person who undertakes to or offers to undertake to, or purports to have the capacity to undertake to, or submits a bid to, or does himself or herself or by or through others, construct, alter, repair, add to, subtract from, improve, move, wreck or demolish any building, . . . or to do any part thereof . . . ."

The CSLL contains two exceptions relevant to this case. Section 7045 provides that the CSLL "does not apply to the sale or installation of any finished products, materials, or articles of merchandise that do not become a fixed part of the structure, nor shall it apply to a material supplier or manufacturer furnishing finished products, materials, or articles of merchandise who does not install or contract for the installation of those items." Section

7052 provides that the CSLL "does not apply to any person who only furnishes materials or supplies without fabricating them into, or consuming them in the performance of, the work of the contractor."

As an example of the practical application of these principles, in *Finley-Gordon Carpet Co. v. Bay Shore Homes, Inc.* (1966) 247 Cal.App.2d 131, 132, the appellate court upheld the trial court's ruling that carpet installed by a "tackless strip method" did not become " 'a fixed part of the structure' " within the meaning of section 7045, stating, "The evidence that the carpets can easily be removed without damaging the apartments sufficiently supports the trial court's finding the carpets did not become a fixed part of the structure." (*Finley-Gorden Carpet Co.*, at p. 132; see also *Walker v. Thornsberry* (1979) 97 Cal.App.3d 842, 848 [holding a manufacturer fell within the scope of § 7045's exception when it provided a prefabricated restroom and had its employees assemble the structure at the construction site and bolt it to a concrete foundation].)

      3.     *Substantial Evidence Supports the Jury's Findings that Zale Did Not Engage in Acts Requiring a Contractor's License*

At the outset, we address what rules we measure the trial evidence against. In arguing that Zale acted as a contractor, Leevan relies on several statutory provisions that do not appear anywhere in the jury instructions, including the definition of " 'home improvement goods' " in section 7151, subdivision (b) and the definition of "home improvement contractor" in section 7150.1. Leevan's reliance on these statutes is unavailing, because "[w]e review the sufficiency of the evidence to support a verdict under the law stated in the instructions given, rather

29

than under some other law on which the jury was not instructed." (*Bullock v. Philip Morris USA, Inc.* (2008) 159 Cal.App.4th 655, 674-675; accord, *Mazik v. Geico General Ins. Co.* (2019) 35 Cal.App.5th 455, 465.)

The trial court instructed the jury on the elements of Leevan's claims that Zale engaged in activities requiring a contractor's license by using the statutory language of section 7031. It also instructed the jury on the definition of "contractor," and the exceptions set forth in sections 7045 and 7052, utilizing the applicable statutory language. Leevan does not contend that the trial court committed any instructional error by utilizing the language of these statutes.[20] At Leevan's request, the court instructed the jury on the definition of "fixture" set forth in Civil Code section 660. Leevan did not request any instructions based on any other statutory provisions, such as sections 7150.1 and 7151.

Accordingly, we measure the sufficiency of the evidence against the jury instructions as given. In doing do, as explained next, we find there was substantial evidence supporting the jury's findings that Zale did not engage in any activity requiring licensure with respect to the four subcontractors at issue: Anton's, A.P. Smiley & Sons, Ruiz, and L.A. Woodworks.

a.    Anton's and A.P. Smiley & Sons.

There was substantial evidence that the window coverings installed by Anton's and the banquette cushions installed by A.P. Smiley & Sons did not become "fixed part[s]" of Leevan's home,

---

[20] As noted above, Leevan did object to the inclusion of an exception for "incidental" services in some of the instructions. We address this issue below.

and therefore were not subject to the CSLL pursuant to section 7045. Iizuka, Anton's owner, described how the window coverings were installed and testified they were "removable." In addition, Zale introduced into evidence photographs of the window coverings which were consistent with Iizuka's testimony. An electrician hired by Silberman, not Zale, hooked up the motors on the Roman shades in the master bathroom.

Zale testified that the banquette cushions "are removable." Zale introduced into evidence a photograph of the kitchen which showed the banquette with the cushions in place. A.P. Smiley & Sons did not install the banquette itself; Leevan hired Paldino to install the cabinets and the banquette and paid Paldino directly.

Leevan contends that "the window coverings and the banquette upholstery each became a fixed part of Leevan's home," but he fails to identify any specific evidence supporting that claim. Even if he had, substantial evidence supports the jury's contrary finding. Relying on Civil Code section 660, Leevan also argues, "[w]hether an item becomes a fixture and acquires permanence depends on intent" and that there was no evidence of his intent regarding the window treatments. We question whether Civil Code section 660 contains a subjective intent requirement, as the plain language of the statute does not mention it. But we need not resolve that question because the jury instruction given, at Leevan's request, did not require the jury to determine Leevan's intent regarding the permanency of any products or materials installed in his home. The instruction, consistent with the statute, required that the product or material be "permanently attached," and there was substantial evidence that neither the window coverings nor the banquette cushions satisfied this requirement.

31

Leevan also contends that a window covering installer is required to have a specialty "D-52" license under the regulations implementing the CSLL. However, the jury instruction on this issue included the following preliminary statement: "Although the Contractors State License Board has issued the following licensing classifications, whether someone is required to have a contractor's license is still subject to the exemptions as stated elsewhere in the Court's instructions." Thus, given there was substantial evidence supporting the conclusion that Anton's' installation work was excepted from the CSLL under section 7045, there was substantial evidence that Anton's did not need any contractor's license. (See *Finley-Gordon Carpet Co. v. Bay Shore Homes, Inc., supra*, 247 Cal.App.2d at pp. 132-133 ["All carpet installers and other specialty contractors *using methods which result in materials becoming a fixed part of the structure* . . . remain subject to the licensing requirement," italics added]; *Steinbrenner v. J. A. Waterbury Constr. Co.*(1963) 212 Cal.App.2d 661, 663 ["The specialty classifications adopted by the registrar of contractors cannot and do not purport to extend the scope of the licensing statute"].)

b.      Ruiz.

It was undisputed that Leevan, not Zale, hired and paid Ruiz for Ruiz's materials and installation work. Leevan contends that Zale "procured Ruiz for the flooring work" and that Zale "persuaded [him] to accept Ruiz's bid," but there was substantial evidence that Leevan accepted Ruiz's proposal because it was lower than the other bids. In any event, there is no evidence that Zale took any of the actions listed in the jury instructions describing section 7026 that would have required a contractor's license with respect to the hardwood floor installation, namely,

32

"undertak[ing]," "offer[ing] to undertake," "purport[ing] to have the capacity to undertake," "submit[ing] a bid to," or "do[ing]" the installation "herself or by or through others."

Although Zale assisted Ruiz in preparing his proposal to Leevan, there is no evidence it was in fact her proposal. She testified she assisted Ruiz because he was not fluent in English, and Ruiz came up with the proposed cost. Zale did review the proposal, but only to ensure it specified the correct type of wood and to determine her design fee.

Silberman, Leevan, and Krumpe were responsible for scheduling the construction; Zale merely communicated the schedule to Ruiz. Zale did not direct Ruiz on the installation of the hardwood floors, and only observed him when he applied the stain to make sure it looked right.

  c. <u>L.A. Woodworks.</u>

There was substantial evidence that Einsiedler of L.A. Woodworks only created the bathroom cabinets and did not install them, and thus Zale was not required to have a contractor's license as a result of her involvement in procuring the cabinets. The jury was instructed, based on section 7052, "A contractor's license is not required by any person who only furnishes materials or supplies without fabricating them into, or consuming them in the performance of, the work of the contractor."

In his reply brief, Leevan for the first time contends that the evidence shows Zale contracted with Leevan to have L.A. Woodworks install the bathroom cabinets, and this was an act of unlicensed contracting even though it turned out that L.A. Woodworks did not install the cabinets. We decline to consider this argument given that it was first raised in Leevan's reply.

33

(*Varjabedian v. City of Madera* (1977) 20 Cal.3d 285, 295, fn. 11 ["Obvious reasons of fairness militate against consideration of an issue raised initially in the reply brief of an appellant"].)

4.     *The Parties' Contract Did Not Require Zale to Undertake Activities Requiring a Contractor's License*

Leevan argues that Zale was required to be licensed to contract with Leevan as a matter of law because she "promised to provide construction supervision and to procure specialty contractors to perform required specialty trade work." We disagree.

First, while "directing or supervising the work performed" can constitute activity requiring a contractor's license (*Contractors Labor Pool, Inc. v. Westway Contractors, Inc.* (1997) 53 Cal.App.4th 152, 165), there was substantial evidence that Zale did not promise to supervise or direct the work of subcontractors. The contract expressly provided that Zale did not have any control over subcontractors' work, stating, "Zale shall not have control over, or charge of, and shall not be responsible for construction means, methods, techniques, sequences or procedures . . . ." Leevan points to a section of the contract titled "[c]onstruction [s]upervision," but the actual services described in the section—"[r]eview contractor bids with clients as required," "[c]onsultation meetings with clients, architect [and] contractors," "[o]bserve work and subcontractors throughout the job," and "[a]ttend jobsite meetings per client and architect's schedule"— are all consistent with Zale being responsible for design and selection of materials, but not for the actual construction. Zale testified that, and provided examples of how, all of these activities related to her design work and gave her the opportunity

34

to provide her input on design elements and ensure that her designs were implemented.

Second, Zale testified without objection that her promise to "procure . . . tangible materials relating to the overall design scheme," including "any specialized subcontracted work (i.e.: wall covering installation, window treatment installation, carpet installation, special paint and finish artists, etc.)," did not mean that she would necessarily hire the installer. The evidence showed that Zale only contracted with some of those who installed materials she had designed; for example, she did not contract with Ruiz, who did work requiring a contractor's license.[21] Furthermore, the parties' contract did not agree on any specific installation work to be performed (and thus did not necessarily include any work that necessarily required licensure). In any event, section 7031 does not apply to the act of contracting without any performance. Both subdivisions (a) and (b) of section 7031 apply to compensation for the "performance of any act or contract," and "[t]he 'act' of executing an agreement is not one for which a contractor seeks compensation; rather, he or she pursues payment for carrying out the contract in a satisfactory manner."

---

[21] *Vallejo Development Co. v. Beck Development Co.*, *supra*, 24 Cal.App.4th 929, cited by Leevan, is distinguishable because the plaintiff, who was found to be acting as an unlicensed contractor, entered "agreements to 'improve the [p]roperty [at issue]' and to be 'solely responsible for completion of' infrastructure improvements . . . including graded building pads, storm drains, sanitary systems, streets, sidewalks, curbs, gutters, utilities, street lighting, and traffic signals" and was thus "clearly contracting to provide construction services." (*Id.* at p. 940, italics omitted.)

35

(*MW Erectors, Inc. v. Niederhauser Ornamental & Metal Works Co., Inc.* (2005) 36 Cal.4th 412, 435, italics omitted.)  As discussed, Zale did not contract with any subcontractors who provided services subject to the CSLL.

Finally, Leevan's argument that Zale acted as a contractor by collecting a fee based on the work of Ruiz, Anton's, A.P. Smiley & Sons, and L.A. Woodworks fails because there was substantial evidence Zale was being compensated for her design services.  In addition, the only subcontractor who provided services subject to the CSLL was Ruiz, and, as discussed, there is no evidence that Zale took, and thus could have been compensated for, any of the actions listed in section 7026 that would have required a contractor's license with respect to Ruiz's installation of the hardwood flooring, such as "undertak[ing]" or "do[ing]" the installation "herself or by or through" Ruiz.  To the contrary, Ruiz undertook to perform the installation by contracting directly with Leevan.

B.    **Zale Did Not Make a Judicial Admission Binding on the Jury by Recording a Mechanic's Lien**

At Leevan's request, the trial court gave an instruction on mechanic's liens, and Leevan's counsel argued that by recording such a lien Zale admitted that she was a contractor subject to licensure.  The jury was unpersuaded, as it found Zale did not perform services requiring a contractor's license.  Leevan contends that Zale's recording of a mechanic's lien and efforts to foreclose on the lien were a binding admission that her work involved "fixtures" regardless of the jury's verdict.

Leevan relies on *Banis Restaurant Design, Inc. v. Serrano* (2005) 134 Cal.App.4th 1035, where the Court of Appeal held that the trial court did not abuse its discretion in denying the plaintiff

leave to amend its claim to allege "that at least a portion of the products and services it provided [on a construction project] did not involve fixtures" (*id.* at p. 1045) and therefore fell within the section 7045 exception. The court reasoned that by asserting a claim to foreclose on a mechanic's lien, the plaintiff admitted that the products and services at issue were fixtures because, "[b]y definition, a mechanic's lien involves fixtures." (*Banis Restaurant Design, Inc.*, at p. 1045.)

We conclude that Zale's invocation of the mechanic's lien remedy does not undermine the judgment in her favor. At the outset, Leevan's argument regarding the lien is untethered to any challenge to a ruling by the trial court, and we decline to find a judicial admission in the first instance. Zale dismissed her mechanic's lien claim and released the lien years before the matter went to trial. (See *Barsegian v. Kessler & Kessler* (2013) 215 Cal.App.4th 446, 452, fn. 2 [" '[t]he trial judge . . . has discretion to relieve a party from the effects of a judicial admission by permitting amendment of a pleading' "].)

Furthermore, we do not find *Banis Restaurant Design, Inc.*, which was decided at the demurrer stage, persuasive in the factual context here. In that case, the plaintiff sought to foreclose on a mechanic's lien, and attached to its complaint the contract and mechanic's lien, which both showed the plaintiff was engaged to perform services requiring licensure. (*Banis Restaurant Design, Inc. v. Serrano, supra*, 134 Cal.App.4th at pp. 1039-1040, 1044.) A demurrer was sustained without leave to amend because the plaintiff was unlicensed, and the plaintiff had not met its burden to demonstrate how it could plead different facts entitling to relief. (*Id.* at p.1047.) Here, in contrast, the jury found that Zale did not engage in unlicensed contracting. Unlike

37

the plaintiff in *Banis Restaurant Design, Inc.*, Zale did not allege in her prior lien or the claim on that lien that she was responsible for the installation of any items which became fixtures.[22] Substantial evidence also showed the contract between Zale and Leevan did not state she was responsible for installation of items that became fixtures.

The purported fact Leevan seeks to impose on Zale, namely, that the items and materials she provided for the project were fixtures, is based on the law applicable to mechanic's liens and is therefore a mixed question of fact and law which is not appropriate for a judicial admission. (*Bahan v. Kurland* (1979) 98 Cal.App.3d 808, 812-813 [the plaintiff not bound by allegation in complaint that the defendant was acting in the course and scope of his public employment].) Further, the law is more unsettled than Leevan suggests. For example, being a fixture for purposes of mechanic's lien law is not necessarily equivalent to being a "fixed part" of an improvement under section 7045. In *Finley-Gordon Carpet Co.*, the court rejected the defendant's argument that by filing a mechanic's lien the plaintiff was precluded from arguing its installation of carpet was exempted from licensure under section 7045, stating, "Neither compelling reason nor authority has been presented, however, to indicate why the law of fixtures should be incorporated into the Legislature's design for licensing contractors." (*Finley-Gordon Carpet Co. v. Bay Shore Homes, Inc.*, *supra*, 247 Cal.App.2d at p.

---

[22] Zale's mechanic's lien asserted that she was owed compensation for "design services," including "design and material selection and procurement of" various materials and items, and "floor plan layout/design/selection/procurement and installation of new interior and exterior furnishings."

132; see also *Scientific Cages, Inc. v. Banks* (1978) 81 Cal.App.3d 885, 888-889 [mechanic's lien law and CSLL have different objectives and the interpretation of one does not necessarily hold in the other]; *Steinbrenner v. J.A. Waterbury Constr. Co.*, *supra*, 212 Cal.App.2d at p. 665 [same].)

## C.     The Alleged Instructional Error Was Harmless

Leevan contends that the trial court erred in instructing the jury that if it concluded Zale had engaged in services requiring a contractor's license, section 7031 would not apply if "those services were incidental to the parties' overall business relationship." This concept was set forth in special instruction No. 2, as well as other instructions. Leevan further argues the court erred in refusing to give his proposed instruction which would have defined "incidental" to mean costing less than $500.

Assuming solely for the sake of argument that the trial court committed the claimed instructional errors, the errors were harmless given the jury's finding that Zale engaged in no activities requiring a contractor's license. "A judgment may not be reversed on appeal, even for error involving 'misdirection of the jury,' unless 'after an examination of the entire cause, including the evidence,' it appears the error caused a 'miscarriage of justice.' (Cal. Const., art. VI, § 13.) When the error is one of state law only, it generally does not warrant reversal unless there is a reasonable probability that in the absence of the error, a result more favorable to the appealing party would have been reached. [Citation.]" (*Soule v. General Motors Corp.* (1994) 8 Cal.4th 548, 574.)

There was no such miscarriage of justice here. The jury found that Zale had not engaged in *any* activity that required a contractor's license, and thus it never reached the issue of

39

whether the "incidental" services exception applied. Any error in describing such incidental services was therefore harmless. Such error could not have impacted the verdict because, as noted, the jury properly skipped the questions on the special verdict form that addressed the "incidental" services exception because the jury did not find that Zale had performed any services requiring a license.

Leevan contends he was nevertheless prejudiced because the erroneous instructions "undoubtedly caused confusion and error over whether Zale was required to have a contractor's license." We fail to see such a connection, and in any event such speculation is insufficient to show that a different result was reasonably probable. Leevan also points out that Zale's counsel argued to the jury that Zale's contracting acts were "incidental." But he fails to show how this argument in the alternative (as Zale's main argument was that her work did not require licensure) impacted the jury's finding that Zale engaged in no acts requiring a contractor's license.[23]

## D. Leevan's Challenge Based on Zale's Closing Argument Fails

At Leevan's request, the trial court instructed the jury, in special instruction No. 10, "A fixture is a thing that is deemed to be affixed to land when it is permanently attached to what is thus permanent, as by means of cement, plaster, nails, bolts, or screws." During his closing, Zale's counsel argued the window

---

[23] Leevan makes additional arguments in his reply brief regarding prejudice, which we decline to address because they were not raised in his opening brief. (*Varjabedian v. City of Madera, supra,* 20 Cal.3d at p. 295, fn. 11.)

coverings and banquette cushions were not "fixtures" as defined in this instruction because they were removable.  Leevan's counsel argued in response that the proper standard for determining a "fixture" was not whether it was "removable," and the custom window coverings and the banquette cushions are "fixtures."

Leevan contends the trial court erred in "permitting" Zale's counsel to argue that something which is removable is not a fixture.  Leevan has forfeited this ground for appeal because he did not object in the trial court.[24]  (*Keener v. Jeld-Wen, Inc.* (2009) 46 Cal.4th 247, 264.)  Even were we to address this issue, we would conclude there was no error as Zale's counsel's argument was consistent with Leevan's requested special instruction No. 10, which stated that a fixture is something "permanently attached" to the structure and, thus, fairly suggests the argument that something "removable" is not a fixture.

Leevan also contends that Zale's counsel's closing argument misstated the law regarding the specialty contractor's license requirements.  Leevan has forfeited this contention because he failed to object in the trial court to Zale's counsel's argument or to special instruction No. 12, which was the basis for the argument. (*Keener v. Jeld-Wen, Inc., supra*, 46 Cal.4th at p. 264.)[25]

---

[24] Leevan incorrectly asserts that the trial court "encouraged" Zale's counsel to make this argument.  All the trial court stated to Zale's counsel, during discussions about special instruction No. 10, was that "if you want to argue it doesn't apply, you're welcome to."

[25] For the first time in his reply brief, Leevan contends that the unclean hands doctrine bars Zale from any recovery because

41

**E.     The Trial Court Did Not Err in Awarding Attorney's Fees**

1.     *Standard of Review*

"[T]he trial court has broad authority to determine the amount of a reasonable fee . . . 'and while [its] judgment is of course subject to review, it will not be disturbed unless the appellate court is convinced that it is clearly wrong'—meaning that it abused its discretion." (*PLCM Group, Inc. v. Drexler* (2000) 22 Cal.4th 1984, 1095.)

Under the abuse of discretion standard, a trial court's "application of the law to the facts is reversible only if arbitrary and capricious." (*Haraguchi v. Superior Court* (2008) 43 Cal.4th 706, 712, fn. omitted.)  "The normal rules of appellate review apply to an order granting or denying attorney fees; i.e., the order is presumed correct, all intendments and presumptions are indulged to support the order, conflicts in the evidence are resolved in favor of the prevailing party, and the trial court's resolution of factual disputes is conclusive." (*Apex LLC v. Korusfood.com* (2013) 222 Cal.App.4th 1010, 1017.)

2.     *The Trial Court Did Not Abuse Its Discretion in Awarding Attorney's Fees to Zale*

Leevan challenges the attorney's fee award on three grounds.  He first contends the trial court "did not properly exercise any discretion with analyzing the evidence" because it accepted Zale's requested lodestar without any deduction.  "The

_____

she admitted to submitting false or altered vendor invoices.  We decline to consider this claim because it was not raised either before the trial court or in Leevan's opening brief.  (*Varjabedian v. City of Madera*, *supra*, 20 Cal.3d at p. 295, fn. 11.)

burden is on the objector [to an attorney's fee award] to show error." (*Karton v. Ari Design & Construction, Inc.* (2021) 61 Cal.App.5th 734, 743.)  Leevan fails to carry this burden because he does not identify any aspect of the fees which he claims the trial court was required to find unreasonable or excessive. Instead, he relies on speculation to assume the trial court did not consider the issues because it did not agree with any of his arguments.  This is insufficient to show an abuse of discretion. Furthermore, Leevan ignores that the trial court stated it had reviewed the billing statements and found them reasonable, and that it specifically referenced and rejected several of the arguments Leevan and his billing expert had raised.

Next, Leevan argues the trial court abused its discretion by "adopt[ing] Zale's theory that Leevan over[-]litigated the case, when there would have been no lawsuit absent [Zale's] billing fraud."  We find no abuse of discretion.  The trial court noted in 2015—nearly seven years before the case eventually went to trial—that the case was being "over-litigated [and] acrimonious" when it sustained a demurrer to Leevan's RICO claim.  The sheer volume of the record after that ruling only confirms the lack of any course correction.  So too does Leevan's disregard of Zale's Code of Civil Procedure section 998 offers.  At the hearing on the attorney's fees motion, in response to Leevan's arguments that Zale's actions were the cause for much of the litigation, the court found that Zale was forced to continue litigating because her offers to compromise, including one in which she offered to pay Leevan $100,000, were rejected.  The court's overlitigation finding was fully supported and the court's rejection of Leevan's argument that Zale should be precluded from recovering fees

43

because she had caused the litigation was not arbitrary or capricious.

Lastly, Leevan argues that the fee award "should . . . be reduced to a reasonable sum commensurate with the modest award of damages and the evidence." Initially, we reject his assertion that we should compare the fee award only to the amount of Zale's recovery for breach of contract. As Zale points out, she prevailed not only on her breach of contract claim, but also on Leevan's cross-claim, which exposed Zale to potential liability in the form of disgorgement of all amounts she had been paid for the remodel, the substantial cost to repair allegedly defective kitchen cabinets, and punitive damages.[26] Furthermore, Leevan cites no authority that an attorney's fee award cannot exceed the prevailing party's recovery, and the caselaw is in fact to the contrary. (See *Taylor v. Nabors Drilling USA, LP* (2014) 222 Cal.App.4th 1228, 1251 ["A reversal is not compelled merely because the lodestar figure substantially exceeds [the] respondent's recovery"].)

Leevan cites *Karton v. Ari Design Construction, Inc.*, *supra*, 61 Cal.App.5th 734, but the case does not aid him. The *Karton* court did not hold that a fee award must be reversed if it exceeds the damages award, or if it exceeds the award by any specific multiple. The court did affirm the trial court's reduction of the lodestar requested by the prevailing plaintiff, but that was based on the trial court's findings the plaintiff had over-litigated the case and the 600 hours of work claimed by the plaintiff's attorney was unreasonable. (*Id.* at pp. 738, 743, 745.) *Karton* is not

___

[26] Leevan decided not to pursue his cost to repair and punitive damages claims only after the close of evidence.

44

applicable here, where the trial court found Zale did not over-litigate, and instead was trying unsuccessfully to "extricate herself from" a case being over-litigated by Leevan.[27]

## DISPOSITION

We affirm the judgment and the trial court's order awarding Zale her attorney's fees. Zale is awarded her costs on appeal.

NOT TO BE PUBLISHED


WEINGART, J.

We concur:


BENDIX, Acting P. J.


KELLEY, J.[*]

---

[27] In a footnote to his argument regarding the fee award, Leevan asserts in passing that the judgment was excessive because it necessarily included Zale's fee based on the work of an unlicensed subcontractor, Ruiz. We do not consider this argument, as Leevan did not challenge the judgment on this ground and provides no cogent analysis in support of this claim. "As a general rule, ' "[w]hen an appellant raises an issue 'but fails to support it with reasoned argument and citations to authority, we treat the point as waived.' " ' [Citation.]" (*Estrada v. Public Employees' Retirement System, supra*, 95 Cal.App.5th at p. 889.)

[*] Judge of the San Luis Obispo County Superior Court, assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.